# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

Filed & Entered
On Docket
June 27, 2019

_____

In re:

     **Nicholas and Amanda Gravel,**　　　　　**Chapter 13 Case**
          **Debtors.**　　　　　　　　　　**# 11-10112**

_____

In re:

     **Allen and Laurie Beaulieu,**　　　　　**Chapter 13 Case**
          **Debtors.**　　　　　　　　　　**# 11-10281**

_____

In re:

     **Matthew and Emilie Knisley,**　　　　　**Chapter 13 Case**
          **Debtors.**　　　　　　　　　　**# 12-10512**

_____

| | |
|---|---|
| *Appearances:* *Mahesha Subbaraman, Esq.* | *Alexandra Edelman, Esq.* |
| *Subbaraman PLLC* | *Primmer Piper Eggleston & Cramer, PC* |
| *Minneapolis, Minnesota* | *Burlington, Vermont* |
| *For the Trustee* | *For the Creditor* |

## MEMORANDUM OF DECISION
### ON REMAND FROM U.S. DISTRICT COURT, IMPOSING SANCTIONS ON PHH MORTGAGE CORPORATION

     The U.S. District Court remanded this matter for this Court to redetermine the amount of sanctions to be imposed on PHH Corporation ("PHH") for its violations of Bankruptcy Rule 3002.1 and Debtor Current Orders, with a focus on the scope of this Court's statutory and inherent authority to impose punitive sanctions. This Court has fulfilled that remand, based on the caselaw to which the District Court pointed, and a recent Supreme Court decision that affirmed the authority of bankruptcy courts to impose sanctions. See Taggart v. Lorenzen, No. 18-489 (U.S. June 3, 2019).

     For the reasons set forth below, the Court finds, first, it has the authority pursuant to Rule 3002.1, pertinent caselaw, and its inherent powers, to impose punitive sanctions on PHH for its violations of Rule 3002.1; second, it has the authority, pursuant to § 105(a) and its inherent powers, to sanction PHH for its breach of the Debtor Current Orders in the Gravel and Beaulieu cases; third, there are specific dollar

amount caps which set the outer limits of "modest," or "less than serious," sanctions; fourth, those caps may be adjusted to correlate to the present value of those dollar amounts; fifth, this Court has the authority to impose punitive sanctions on PHH for its Rule and Court Order violations, provided the amount of the sanction imposed in each case does not exceed the caselaw-defined cap for a non-serious sanction; and sixth, based on the facts and circumstances of these cases, it is appropriate for PHH to pay the sanctions for its Rule 3002.1 violations to the chapter 13 trustee (the "Trustee") and pay the sanctions attributable to its Court Order violations to Legal Services Vermont.

Based on these findings, the Court (1) is reducing the combined sanction from $225,000 to $175,000 in the Gravel case, reducing the combined sanction from $125,000 to $100,000 in the Beaulieu case, and leaving intact the sanction of $25,000 in the Knisley case; and (2) directing PHH to pay the portion of the sanctions allocable to PHH's violation of the Rule 3002.1 in each of the three cases, i.e., $25,000 per case, to the Trustee, and directing PHH to pay the portion of the sanctions allocable to PHH's violation of the Debtor Current Orders, i.e., $150,000 in the Gravel case and $75,000 in the Beaulieu case, to Legal Services Vermont (f/k/a Legal Services Law Line of Vermont).

# I. JURISDICTION

The Court has jurisdiction over these contested matters pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Order of Reference entered on June 22, 2012. The Court declares the issues raised in the contested matter in each of these cases, and on remand, to be core proceedings, pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O), over which this Court has constitutional authority to enter a final judgment.

# II. PROCEDURAL HISTORY AND DIRECTION FROM THE DISTRICT COURT

On September 12, 2016, this Court entered an Order granting the Trustee's motions to sanction PHH, disallowing PHH's post-petition charges, and directing PHH to pay sanctions of $275,000, $175,000 and $25,000, respectively, in the Gravel, Beaulieu, and Knisley cases, to Legal Services Law Line of Vermont (Gravel, docs. ## 82, 83; Beaulieu, docs. ## 99, 100; Knisley, docs. ## 55, 56) (the "Sanctions Decision").[1] On September 21, 2016, PHH filed a notice of appeal (doc. # 87). On December 18, 2017, the U.S. District Court (Crawford, J.) issued its decision vacating this Court's decision and remanding the matter to this Court (doc. # 104, the "Remand Decision"). Thereafter, the Debtors and Trustee filed an appeal of the District Court's Remand Decision, in the Second Circuit Court of Appeals. That Court dismissed the appeal, finding the Remand Decision was not a final order (doc. # 109). Thus, this matter was once again before this Court.

---

[1] In the interest of simplicity, all docket references in this decision cite to the Gravel case docket only; all documents, however, can be found in all three chapter 13 bankruptcy cases.

In the Remand Decision, the District Court observes that "[t]he basis for the sanctions was the admitted violation of Bankruptcy Rule 3002.1" (doc. #104, p. 1), and PHH's violation of Debtor Current Orders in two of the three cases (doc. # 104, pp. 4, 5). The District Court described the scope of the appeal as limited: PHH's challenge to this Court's imposition of sanctions (in the amount of $225,000 in the Gravel case, $125,000 in the Beaulieu case, and $25,000 in the Knisley case[2]). The District Court remanded the matter with instructions that this Court reconsider the amount of sanctions, focusing on this Court's authority to only impose sanctions that are "short of punitive sanctions of the scope and type [this Court previously] imposed in these cases" (doc. # 104, p. 17).

### III. LEGAL ISSUES ON REMAND

The District Court remanded this matter to this Court to make a single determination: In light of PHH's violations of Rule 3002.1 and the Debtor Current Orders in these three cases, and consistent with the caselaw it highlighted, what sanctions are less than serious and, as such, within this Court's authority to impose?[3]

To fulfill that remand, and determine the appropriate amount of sanctions to impose on PHH for its misconduct in these cases, the Court analyzes six component legal issues: First, does this Court have the authority to impose punitive sanctions on PHH for its violations of Bankruptcy Rule 3002.1 and, if so, what is the source of that authority? Second, does this Court have the authority to impose sanctions on PHH for its violations of Debtor Current Orders and, if so, what is the source of that authority? Third, what guidance can be drawn from the decisions favorably cited by the District Court in its Remand Decision, as well as any pertinent Second Circuit or Supreme Court caselaw, as to the scope and size of punitive sanctions this Court is authorized to impose? Fourth, what weight should this Court assign to factors such as PHH's corporate status, its substantial financial resources, and its prior violations of the same duties, in deciding what punitive sanctions are warranted here? Fifth, is there authority to adjust the caselaw-established caps defining what is a serious sanction, and what is less than a serious sanction, to reflect the passage of time and the present value of those dollar amount caps? Sixth, in the context of the

---

[2] As will be discussed in detail below, the District Court focused on the total sanctions awarded in all 3 cases: $300,000 for violation of Court Orders, and $75,000 for violations of Rule 3002.1, rather than on the sanctions awarded in each case. See discussion at Part D.

[3] The final paragraphs of the Remand Decision stated:

> … [t]his court concludes that the statutory and inherent powers of the Bankruptcy Court are not sufficient to support the Bankruptcy Court's imposition upon PHH of $300,000 in punitive sanctions. The court notes that this conclusion does not leave Bankruptcy litigants free to engage in contemptuous conduct with impunity.
> … [The Bankruptcy Court] may take steps to enforce its orders short of punitive sanctions of the scope and type imposed in these cases.

(doc. # 104, pp. 16–17) (emphasis added).

particular facts presented in these cases, and the interest of justice, to whom should PHH pay the sanctions this Court imposes in each of these cases?

## IV. FINDINGS OF FACT ESSENTIAL TO REMAND

Since, as the District Court observed, "[t]he facts giving rise to [the instant] appeal were not in dispute before the Bankruptcy Court and are not challenged on appeal" (doc. # 104, p. 2), the Court recites only those findings of fact that are essential to fulfilling the remand.

In the Gravel case, this Court had entered an order on May 20, 2016, determining Mr. and Mrs. Gravel had cured all prepetition mortgage defaults and were current on all postpetition mortgage payments to PHH (a "Debtor Current Order"). That order declared

> the debtors, by their payments through the Office of the Chapter 13 Trustee, have made all payments due during the pendency of this case through April 1, 2016, including all monthly payments and any other charges or amounts due under their mortgage with PHH Mortgage Corporation.

(doc. # 74) (emphasis added). On May 25, 2016, five days after entry of the Debtor Current Order, PHH sent the Debtors a mortgage statement for the month of May 2016 which, contrary to the recently entered Debtor Current Order, asserted the Debtors owed PHH property inspection fees of $258.75. The Trustee filed a motion seeking an order finding PHH to be in contempt and imposing sanctions on PHH (doc. # 75). PHH opposed that relief, arguing, inter alia, that this was a one-time error (doc. # 77). The Trustee vigorously disputed that assertion, pointing out that (i) PHH had sent out at least fifteen other mortgage statements that included postpetition fees and expenses without filing a single Rule 3002.1(c) notice, (ii) PHH had been chastised by another bankruptcy court for violating Rule 3002.1(c), see In re Owens, 2014 Bankr. LEXIS 163 (Bankr. W.D.N.C. 2014), (iii) PHH had assessed improper charges in other cases in this District, and (iv) this Court had previously imposed a consensual sanction of $9,000 on PHH, in this case, based on PHH's repeated misapplication of mortgage payments and issuance of dozens of erroneous monthly mortgage statements to Mr. and Mrs. Gravel for over two years (see doc. # 49). The Trustee claimed sanctions were warranted and necessary based on PHH's flagrant violation of both Rule 3002.1 and the Debtor Current Order in this case.

The factual and procedural posture of the Beaulieu case is substantially similar to that of the Gravel case: On May 5, 2016, the Court entered a Debtor Current Order, determining Mr. and Mrs. Beaulieu had cured all prepetition mortgage defaults and were current on all postpetition mortgage payments due to PHH (case # 11-10281, doc. # 82). Notwithstanding entry of that Order, less than three weeks later, on May 25, 2016, PHH sent out a monthly statement that included old charges (an NSF fee of $30 and a property inspection fee of $56.25) — charges for which it had never sent a Rule 3002.1(c) notice. On June 14, 2016, the Trustee filed a motion for contempt and sanctions (doc. # 90, the "Beaulieu

Sanctions Motion"), essentially articulating the same arguments and seeking the same relief as in the Gravel Sanctions Motion, with regard to both PHH's failure to comply with Rule 3002.1 and PHH's violation of the Debtor Current Order. PHH filed opposition to the Beaulieu Sanctions Motion (doc. # 95), and the Trustee filed a response to that opposition (doc. # 96), both of which contained the same arguments they had made in the Gravel case. The facts of the Beaulieu case differ materially from the Gravel case in only three respects: (i) PHH charged postpetition fees to the Beaulieus' account on dates, and in amounts, that differed from the Gravels; (ii) PHH did not respond to the Trustee's motion for final determination before the Debtor Current Order was entered in Beaulieu; and (iii) PHH was not previously sanctioned in the Beaulieu case.

PHH issued incorrect mortgage statements in the Knisley case, as well, but there was no Debtor Current Order yet in this case. Therefore, the Trustee's motion for contempt and sanctions in Knisley was limited to PHH's failure to comply with Rule 3002.1 (doc. # 50, the "Knisley Sanctions Motion"). The Trustee alleged in this case that PHH issued a monthly mortgage statement on May 25, 2016 that included charges more than 180 days old ($246.50 in property inspection fees and $124.50 in late charges), without having filed the required and corresponding Rule 3002.1(c) notices. PHH opposed the Knisley Sanctions Motion (doc. # 51), and the Trustee responded to that opposition (doc. # 52), both of which set forth the same arguments made in the other two cases, with respect to PHH's Rule 3002.1 violation.

This Court found below, and the District Court left undisturbed, that PHH was in consistent violation of Rule 3002.1 for 25 months in each of the three cases, and sent 25 incorrect statements to each of the Debtors.[4] That is to say, on 75 separate occasions, PHH failed to detect that its borrower was current, or erroneously determined its borrower was in default, and issued a notice that contradicted the information its representative had filed with this Court, under penalty of perjury, and upon which the Court relied in issuing the two Debtor Current Orders in the borrowers' bankruptcy cases. As a direct result of PHH's inaccurate filings, on 25 occasions, each of the three Debtors received a notice that erroneously stated the Debtors were behind on their mortgage payments and likely caused those Debtors to worry that, notwithstanding their belief that they had made all required payments, their mortgage loan was in default and they were at risk of losing their home.[5]

---

[4] Although the Trustee provided evidence that PHH sent incorrect mortgage statements to the Debtors over a period of years, in the interest of simplicity and to provide PHH the benefit of the doubt that it would fulfill its pledge to alter its procedures after the first sanction was imposed against it in the Gravel case (doc. # 49, entered Mar. 31, 2014), this Court arrived at the number of sanctionable Rule 3002.1 violations, for purposes of the Sanctions Decision, by computing the number of months from the date of its previous sanction against PHH to the monthly statements sent in May 2016. The 25 months yielded by this calculation was the basis for the Rule 3002.1 sanctions imposed against PHH in each of the three cases (doc. # 82, p. 10).

[5] These fears are not without rational basis. It is well-documented that mortgage lenders have admitted to foreclosing on mortgage loans based on erroneous records, See, e.g., Ranae Merle, Wells Fargo Admits it Incorrectly Foreclosed on 545 Homeowners It Should have Helped, THE WASHINGTON POST, (Nov. 6, 2018),

The District Court also left undisturbed this Court's finding that PHH's conduct, in sending notices that incorrectly stated the Debtors were in default, violated the Debtor Current Orders that had been entered in the Gravel and Beaulieu cases.

Likewise, the District Court left undisturbed this Court's determination of the factors to be considered when determining the amount of the sanctions, and this Court's findings with respect to each factor (doc. # 82, p. 14–16). In that regard, this Court had found (1) PHH had adequate notice of the Debtor Current Orders, (2) PHH had engaged in a pattern of the offending conduct, (3) PHH had previously been admonished twice and sanctioned once (in this Court) for sending incorrect statements, and (4) PHH's level of sophistication and available financial resources mandated a higher sanction than might be imposed on another party.[6] As this Court indicated in its prior ruling, it is "mindful of the need to limit the magnitude of the sanction to the amount necessary to deter future misconduct," and to fix the sanctions in amounts that is "warranted, reasonable, and necessary to communicate to PHH the gravity of its violation of this Court's Debtor Current Order in this case, to punish the violation, and to deter PHH from violating court orders in the future" (doc. # 82, p. 16). On remand, the task of this Court is to reformulate the sanctions, articulate the source of the Court's authority for the sanctions, and explain the basis for characterizing them as "less than serious."

## V. DISCUSSION

### A. THIS COURT'S AUTHORITY TO IMPOSE SANCTIONS FOR VIOLATIONS OF RULE 3002.1 AND VIOLATIONS OF THE DEBTOR CURRENT ORDERS

In the Remand Decision, the District Court examined the three sources of authority upon which this Court had relied in imposing sanctions on PHH, namely, Bankruptcy Rule 3002.1, this Court's inherent powers, and 11 U.S.C. § 105.[7] Therefore, this Court will begin with an analysis of those sources of authority, to ensure a determination that is congruent with the Remand Decision.

### 1. *Authority to Impose Punitive Sanctions for Violations of Rule 3002.1*

With respect to Rule 3002.1, the District Court pointed out there is no precedent for the imposition of punitive sanctions under this Rule and held "[t]he authority conferred by Rule 3002.1(i) cannot exceed the scope of the substantive powers of the Bankruptcy Court" and "the Bankruptcy Court's order imposing sanctions pursuant to Rule 3002.1(i) exceeded the scope of the Bankruptcy Court's powers as delineated by statute and precedent" (doc. # 104, p. 9). Based on these premises, it concluded the

---

https://www.washingtonpost.com/business/2018/11/06/wells-fargo-admits-it-incorrectly-foreclosed-homeowners-it-should-have-helped/?utm_term=.ca5d432cd9a5.

[6] Though not disturbed, the District Court did not discuss the factor considering a sanctioned party's financial resources and ability to pay, so this Court addresses it below. See discussion at Part C(3).

[7] All citations to statutory sections refer to Title 11, United States Code (the "Bankruptcy Code"), unless otherwise indicated.

imposition of the $25,000 sanction in each case, for violating the Bankruptcy Rule requirements, "exceeded the scope of [the Court's authority under] Rule 3002.1(i)" (doc. # 104, p. 9).

While the District Court observed that "[t]he question of whether Rule 3002.1(i) authorizes the imposition of punitive sanctions appears to be a question of first impression, not just in the Second Circuit, but across the nation" (doc. # 104, p. 8), it did not rule that Rule 3002.1(i) precludes the awarding of a punitive sanction as a form of "other appropriate relief." This Court must determine the outer limits of bankruptcy courts' substantive, statutory, and precedential authority to ensure that the sanctions it imposes under Rule 3002.1(i) do not exceed those limits.

Bankruptcy Rule 3002.1 went into effect in 2011, in order to protect the fresh starts of chapter 13 debtors by requiring the holders of claims secured by a debtor's principal residence to timely file a detailed notice setting forth all postpetition fees, expenses, and charges it seeks to recover from the debtor. <u>See</u> FED. R. BANKR. P. 3002.1(c). As noted by the Advisory Committee on Bankruptcy Rules, "Rule 3002.1 … assists in the implementation of § 1322(b)(5) of the Bankruptcy Code."[8] The requirements of Rule 3002.1, in combination with the requirements imposed by Rule 3001(c), "are designed to allow bankruptcy court determination of any questions regarding the status of a debtor's home mortgage during a Chapter 13 case, eliminating the possibility of unexpected deficiencies at the time the case closes." Eugene R. Wedoff, <u>Proposed New Bankruptcy Rules on Creditor Disclosure and Court Enforcement of the Disclosures – Open for Comment</u>, 83 AM. BANKR. L.J. 579, 584 (2009).

Subparagraph (i) of Rule 3002.1 was added as an enforcement mechanism and may be invoked when a creditor fails to comply with the requirements of the rule, in language modeled after Federal Rule of Civil Procedure 37. This subparagraph identifies the penalty for failure to comply as follows:

> (i)  FAILURE TO NOTIFY. If the holder of a claim fails to provide any information as required by subdivision (b), (c), or (g) of this rule, the court may, after notice and hearing, take either or both of the following actions:
>> (1) preclude the holder from presenting the omitted information, in any form, as evidence in any contested matter or adversary proceeding in the case, unless the court determines that the failure was substantially justified or is harmless; or
>> (2) <u>award other appropriate relief</u>, including reasonable expenses and attorney's fees caused by the failure.

FED. R. BANKR. P. 3002.1(i)(emphasis added). Rules 3001(c) and 3002.1 were introduced, developed, and enacted concurrently; "they employ the same enforcement mechanism for required disclosure," and "are modeled after those for failure to make ordered discovery" under the Federal Rules of Civil Procedure.

---

[8] Report of the Advisory Committee on Rules of Bankruptcy Procedure, Bankruptcy Rules Committee Report, p. 6 (May 2009), https://www.uscourts.gov/rules-policies/archives/committee-reports/advisory-committee-rules-civil-procedure-may-2009.

Wedoff, supra, at 584. Indeed, "the proposed sanctions most closely resemble the sanction available under Civil Rule 37(c)(1) for the failure to provide information required under the disclosure provisions of Rule 26(a)(3)."[9]

PHH alleges that "[n]one of the Committee reports or minutes contained any discussion concerning broad monetary sanctions intended to penalize creditors or act as a warning of the importance of complying with disclosure provisions" (doc. # 127, p. 15). Citing this, and pointing to the modeling of Rule 3002.1 on the language of Federal Civil Rule 37, PHH argues that any sanctions under Rule 3002.1(i) are limited to evidentiary exclusion of any improperly noticed fees or charges in any proceeding before the court, and attorney's fees incurred to enforce that exclusion (doc. # 127, p. 15). The same "legislative history"[10] upon which PHH relies, however, indicates first, the evidentiary exclusion to which PHH refers was already in Rule 3001 before the adoption of Rules 3001(c) and 3002.1 and, second, the addition of specifically enumerated sanctions in Rule 3001(c)(2)(D) and Rule 3002.1(i) were added with the intention of bolstering that preexisting exclusion remedy. See 2010 Committee Memo, supra note 9, at 12 ("Currently, loss of the evidentiary effect of prima facie validity is the only sanction included in Rule 3001 for the failure to execute and file a [proof of claim] in accordance with the rules. The proposed addition of Rule 3001(c)(2)(D) was based on the Advisory Committee's belief that stronger sanctions are required to ensure greater compliance with the rule's requirements.") (emphasis added).

PHH also misconstrues the significance of the discretion afforded to courts pursuant to their authority to impose "other appropriate relief." See FED. R. BANKR. P. 3002.1(i)(2). The Committee's notes indicate the members of the Advisory Committee supported a broad reading of "other appropriate relief." See 2010 Committee Memo, supra note 9, at 13 ("[The court] may impose a sanction other than the preclusion of the introduction of evidence."). Judge Wedoff, an influential member of the Advisory Committee on Bankruptcy Rules at the time Rule 3002.1 was drafted and future chair of that Committee, described the import of a bankruptcy court's ability to award "other appropriate relief" as an additional measure beyond the specifically enumerated relief of evidentiary preclusion and attorney's fees and costs:

[Rule 3001(c)(2)(D) and 3002.1(i)] employ the same enforcement mechanism for

---

[9] Advisory Committee on Rules of Bankruptcy Procedure, Subcommittee on Consumer Issues, Memorandum on Comments to Proposed Rules 3001(c) and Rule 3002.1, p. 12 (Apr. 7, 2010), https://www.uscourts.gov/sites/default/files/fr_import/BK2010-04.pdf [hereinafter 2010 Committee Memo].

[10] In its Memorandum on Remand, PHH characterizes the Advisory Committee's reports and minutes as "legislative history." See, e.g., doc. # 127, p. 18. While the Federal Bankruptcy Rules "are a legislative enactment" and should be interpreted using the "traditional tools of statutory construction," any pertinent legislative history is still confined to the reports, hearing transcripts, and statements generated by Congress and its various committees. See Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 163–65 (1988) (interpreting the Federal Rules of Evidence). Nevertheless, while not constituting legislative history per se, the Advisory Committee materials are "particularly relevant in determining the meaning of the document Congress enacted," especially where Congress does not address or amend the Advisory Committee's draft in any meaningful way on the question at hand. Id. at 165 n. 9.

required disclosure – generally, the potential for a creditor being barred from
introducing at a later hearing the information that was not timely provided, as well as
reimbursing the debtor for reasonable expenses and attorneys' fees, <u>with other relief
in the court's discretion</u>.

Wedoff, <u>supra</u>, at 584 (emphasis added). Moreover, the caselaw construing former Bankruptcy § 304(b),

which employed the same language as Rule 3002.1(i), also supports a broader reading of "other

appropriate relief."[11] <u>See, e.g.</u>, <u>In re Gee</u>, 53 B.R. 891, 896–97 (Bankr. S.D.N.Y. 1985).

In the Remand Decision, the District Court referred to the absence of caselaw concerning Rule

3002.1 sanctions, remarking, "[t]he parties have not cited and the court has not found any case from any

American jurisdiction in which a bankruptcy court has imposed sanctions on this basis and in this

manner" (doc. # 104, p. 8–9). The scarcity of decisions discussing the subject of Rule 3002.1 sanctions is

not surprising in light of the fairly recent implementation of that Rule. Despite the lack of controlling

precedent, however, and based on the District Court's observation, this Court may be guided by caselaw

that is pertinent to the scope of Rule 3002.1(i) sanctions, and properly classified as persuasive authority

for a determination of the issue at bar. <u>See</u> <u>Detroit Edison Co. v. Michigan Dep't of Envtl. Quality</u>, 29 F.

Supp. 2d 786, 791 (E.D. Mich. 1998) ("This is the very definition of a question of first impression: no

precedent compels an answer by <u>stare decisis</u>. Thus I find that I have at hand only the suggestions of

persuasive authority …); <u>see also</u> <u>In re Pilgrim's Pride Corp.</u>, 690 F.3d 650, 665 n. 18 (5th Cir. 2012)

(finding fee-shifting caselaw can provide persuasive authority when resolving fee disputes in bankruptcy

proceedings that are matters of first impression).

On this issue, persuasive authority can be found in caselaw interpreting the rules on which the

language of Rule 3002.1 was modeled: Bankruptcy Rule 3002(c) and Federal Rule of Civil Procedure

37.[12] <u>See, e.g.</u>, <u>Smith v. City of Jackson, Miss.</u>, 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the

same language in two statutes having similar purposes, particularly when one is enacted shortly after the

other, it is appropriate to presume that Congress intended that text to have the same meaning in both

---

[11] In the context of international bankruptcy cases, until the passage of BAPCPA in 2005, 11 U.S.C. § 304(b) granted a
bankruptcy court the power to:
      (1) enjoin the commencement of --
        (A) any action against --
          (i) a debtor with respect to property involved in such foreign proceeding; or
          (ii) such property; or
        (B) the enforcement of any judgment against the debtor with respect to such property, or
      any act or the commencement or continuation of any judicial proceeding to
      create or enforce a lien against the property of such estate;
      (2) order other appropriate relief.
[12] PHH also recognized the value of considering decisions analyzing Rule 37 sanctions to resolve the Rule 3002.1 issue. <u>See</u>
doc. # 127, p. 20 ("Accordingly, case law germane to Rule 37(c)(1) is of particular and dispositive relevance to the analysis
here, particularly given the interpretation of substantively identical language.").

statutes."); <u>Wasser v. N.Y. State Office of Vocational & Educ. Servs. For Individuals with Disabilities</u>, 602 F.3d 476, 479 (2d Cir. 2010) (holding nearly identical language in two statutes designed to "assist individuals with disabilities" should be interpreted identically); <u>Hyland v. New Haven Radiology Assoc., P.C.</u>, 794 F.2d 793, 796 (2d Cir. 1986) (finding that, because three statutes have a similar purpose, cases construing the definitional provisions of one are persuasive authority when interpreting the others); <u>Omega Overseas, Ltd. v. Griffith</u>, 2014 U.S. Dist. LEXIS 109781, at *14 (S.D.N.Y. 2014) ("Given the identical language in § 215(b) and § 29(b) and the close relationship between the IAA and the Exchange Act – both in terms of their dates of passage and their purposes … that case law is highly persuasive here.").

There are many instances in which the evidentiary exclusion remedy provides little, if any, relief in the context of Rule 3001(c) and Rule 3002.1 sanctions motions. <u>See</u> <u>In re Davenport</u>, 544 B.R. 245, 250 (Bankr. D.D.C. 2015) (finding "there can be no proceeding in which the evidentiary penalty of Rule 3001(c)(2)(D) could come into play" because "the chapter 13 plan has been fully administered"); <u>In re Reynolds</u>, 2012 Bankr. LEXIS 3517 (Bankr. D. Colo. 2012) ("At a hearing where the merits of a claim are not at issue, the penalty set out in Rule 3001(c)(2)(D) is meaningless because it only comes into play at a hearing on the merits of a claim where a court would otherwise entertain the type of evidence required by Rule 3001(c)(1).").

There are also many instances in which awarding attorney's fees and costs may prove insufficient "to deter those who might be tempted to such conduct in the absence of such a deterrent." <u>Roadway Express, Inc v. Piper</u>, 447 U.S. 752, 764 (1980). This predicament is described in a number of decisions that have interpreted Rule 37(c) and determined punitive sanctions were warranted, in addition to compensatory awards of fees and costs. For example, in <u>Bradley v. Sunbeam Corp.</u>, 2003 U.S. Dist. LEXIS 14451 (N.D. W. Va. 2003) the district court commented upon the remedies available under Federal Rule 37(c):

> Those remedies specifically allow for the exclusion of the evidence at trial. The rule also provides that the Court 'may impose other appropriate sanctions,' and that in addition to awarding attorney's fees and costs, the Court may also issue sanctions authorized under Rule 37(b)(2)(A), (B), and (C).

<u>Id.</u> at *46. The <u>Sunbeam</u> court went on to find that, "since this case is settled, the sanctions authorized in Rule 37(b)(2) are of no use here. Accordingly, other appropriate sanctions must be issued." <u>Id.</u> at *47. That court imposed a $200,000 sanction on Sunbeam, finding "[t]he only sanction that is appropriate in this case is for Sunbeam and its national counsel to pay a significant fine." <u>Id.</u> at **47, 60. The Eastern District of New York reached a similar conclusion on the available sanctions under Rule 37 in <u>Nycomed US, Inc. v. Glenmark Generics Ltd.</u>, 2010 U.S. Dist. LEXIS 82014 (E.D.N.Y. 2010). There, the court

concluded an appropriate remedy for Glenmark's Rule 37 violations was "the imposition on Glenmark of a compensatory fine of $100,000 payable to Nycomed to cover a portion of its costs, and an additional monetary fine of $25,000 payable to the Clerk of the Court." Id. at *38. See also Capellupo v. FMC Corp., 126 F.R.D. 545, 551, 553 (D. Minn. 1989) (looking to Rule 37 for guidance and multiplying the plaintiff's fees and costs by a factor of two, because it was not convinced that attorney's fees and costs "alone will fully compensate plaintiffs for the harm done to them" or "adequately punish defendant and deter future transgressions"); Nat'l Ass'n of Radiation Survivors v. Turnage, 115 F.R.D. 543, 559 (N.D. Cal. 1987) (requiring the defendant to pay plaintiff's fees and costs and "pay an additional sum of $15,000" to the clerk of court for its Rule 11 violations and Rule 37 discovery abuses).

This flexibility-infused interpretation of the phrase, "other appropriate relief," allows a court to tailor the punitive sanction to be imposed when a party violates a particular rule according to the specific circumstances of the party's conduct. This approach has also been followed with respect to Federal Rules 16(f) and 37(b), which contain a similarly broad provision that allows the court to "issue any just orders" or "issue further just orders."[13] In J.M. Cleminshaw Co. v. Norwich, 93 F.R.D. 338 (D. Conn. 1981), the court considered the dilemma of awarding only attorney's fees and costs under Rule 37 when "the defendant has engaged in a prolonged and unjustified failure to provide discovery," and when the "plaintiff has claimed a very small sum in fees and expenses [$150]." Id. at 343-44. That court cited the language of Rule 37(b), which allows a court to issue further "just orders," and "to fashion a sanction which more adequately achieves both the goals of compensation and of punishment," as authority for it to impose punitive sanctions. Id. at 344. Looking to the broad language in Rule 37(b), the court found,

> There is no indication in Rule 37 that this list of sanctions was intended to be exhaustive. Indeed, the fact that Rule 37 also provides for the entry of such orders "as are just" suggests that, under that rule, a court possesses the authority to fashion any of a range of appropriate orders to enforce compliance with the requirements of pre-trial discovery.

Id. at 355 (citing Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974)). In addition to awarding the plaintiff the fees and costs totaling $150, the court required the offending party to pay a punitive fine of $150 to the clerk of the court. Cleminshaw, 93 F.R.D. at 360.

In In re Prudential Ins. Co. of Am. Sales Practices Litig., 169 F.R.D. 598 (D.N.J. 1997), the court considered sanctions under Rule 16(f) for Prudential's failure to preserve documents and, most significantly, its "consistent pattern of failing to prevent unauthorized document destruction[.]" Id. at 616.

---

[13] Rule 37(b)(2)(A) provides, in the event a party does not obey a discovery order, "the court where the action is pending may issue further just orders," including those specifically enumerated in (i)-(vii) such as striking pleadings, dismissing the action, or entering a default judgment.

11

In determining it would "impose Federal Rule of Civil Procedure 16(f) sanctions," and after considering "the financial worth of Prudential," the district court not only awarded plaintiff's counsel all fees and costs the plaintiff had incurred, but also imposed a punitive sanction of $1,000,000 against Prudential for "the unnecessary consumption of the Court's time and resources" and to "inform[] Prudential and the public of the gravity of repeated incidents of document destruction and the need of the Court to preserve and protect its jurisdiction and the integrity of the proceedings before it." Id. at 616–17. The District of Massachusetts adopted a similar interpretation of the meaning of "just orders" in Pereira v. Narragansett Fishing Corp., 135 F.R.D. 24 (D. Mass. 1991). The court there found awarding the $550 in fees and costs which resulted from the plaintiff's discovery violations was "too small an amount to qualify as an appropriate sanction considering the egregious nature of the violations" in that case. Id. at 26. The court further found that "the phrase 'may make such orders as are just' as used in both Rules 16(f) and 37(b)(2) permit the imposition of a sanction in the form of a monetary fine which is paid to the court and not to an opposing party as reimbursement for costs and attorney's fees" and "without proceeding to a finding of contempt[.]" Id. at 27. On that basis, the district court directed the offending party to pay the $550 in fees and costs and a $2,500 punitive sanction.

These cases, interpreting language that is analogous, similar, or identical to that of Rule 3002.1(i) are persuasive authority and create a solid basis for this court to interpret Rule 3002.1(i) as authorizing a broad panoply of "other appropriate relief" that includes punitive sanctions. In the absence of caselaw construing punitive sanctions under Rule 3002.1, this Court relies on the persuasive authority described above, to determine the parameters of its authority to impose "other appropriate relief" as a sanction against PHH, for its Rule 3002.1 violations.

　　　2. _Authority to Impose Punitive Sanctions for Violations of the Debtor Current Orders_

This Court imposed punitive sanctions on PHH for its violations of Debtor Current Orders pursuant to its statutory and inherent authority, and the District Court remanded on this point, based on the lack of Second Circuit caselaw on point and its endorsement of the appellate decisions which espoused a more limited view of bankruptcy courts' authority to impose punitive sanctions. The District Court concluded, "the statutory and inherent powers of the Bankruptcy Court are not sufficient to support the Bankruptcy Court's imposition upon PHH of $300,000 in punitive sanctions [for violation of court orders]" (doc. # 104, p. 16).

With regard to a bankruptcy court's statutory authority to impose punitive sanctions for violations of court orders pursuant to § 105(a), the District Court stated its preference for the approach of the Sixth and Ninth Circuits. See In re John Richards Homes Bldg. Co., 552 F. App'x 401 (6th Cir. 2013); Knupfer v. Lindblade (In re Dyer), 322 F.3d 1178 (9th Cir. 2003). These circuit courts have found "the language of

§ 105(a) simply does not allow for … serious punitive penalties[,]" and also acknowledged the possibility that "'relatively mild' non-compensatory fines may be necessary under some circumstances." Dyer, 322 F.3d at 1193; see also Richards, 552 F. App'x at 415 ("[W]hile § 105(a) grants bankruptcy courts the authority to award mild noncompensatory punitive damages, it does not provide a basis for awarding serious noncompensatory punitive damages."). Those circuits made a similar determination as to a bankruptcy court's ability to impose serious punitive sanctions under its inherent sanction authority. Dyer, 322 F.3d at 1197; Richards, 552 F. App'x at 415. Before addressing the pertinent caselaw addressing a bankruptcy court's ability to impose punitive sanctions, and the guidance the Second Circuit has offered on the question of what constitutes a "serious sanction,"[14] the Court reviews PHH's violations of specific court orders, and the grounds those violations establish for imposing punitive sanctions, in light of the Supreme Court's recent decision in Taggart v. Lorenzen, No. 18-489 (U.S. June 3, 2019).

In the opening paragraph of Taggart, the Supreme Court describes the purpose of a discharge order in a bankruptcy case and the restrictions a discharge order imposes on creditors, to introduce the issue of whether a bankruptcy court has the authority to punish creditors who violate these orders:

> At the conclusion of a bankruptcy proceeding, a bankruptcy court typically enters an order releasing the debtor from liability for most prebankruptcy debts. This order, known as a discharge order, bars creditors from attempting to collect any debt covered by the order. See 11 U.S.C. § 524(a)(2). The question presented here concerns the criteria for determining when a court may hold a creditor in civil contempt for attempting to collect a debt that a discharge order has immunized from collection.

Taggart, slip op. at 1. Echoing the language of the Bankruptcy Code, the Court held "[a] discharge order 'operates as an injunction' that bars creditors from collecting any debt that has been discharged." Id. at 3. This is important because the orders PHH violated in these cases were also entered as injunctions, to enjoin certain described conduct, by a particular class of creditors.[15]

A Debtor Current Order, entered by the court "on motion of the debtor or trustee[,]" after notice and hearing, determines whether a debtor has (i) made all payments necessary to cure any default on a claim secured by the debtor's principal residence, and (ii) paid all required postpetition amounts. See FED. R. BANKR. P. 3002.1(h). Once entered by a bankruptcy court, a Debtor Current Order is a limited injunction in that it prohibits the mortgage creditor from attempting to collect (i) any prepetition mortgage arrearage that the Order declared to be cured, (ii) any postpetition amounts that the Order declared to be

---

[14] See discussion at Part B.

[15] An injunction is "[a] court order commanding or preventing an action." BLACK'S LAW DICTIONARY (11th ed. 2019). See also Edgar v. Mite Corp., 457 U.S. 624, 649 (1982) (Stevens, J., concurring) ("An injunction restrains conduct. Its effect is normally limited to the parties named in the instrument.").

paid, or any (iii) fees or expenses that were not properly noticed pursuant to Rule 3002.1(b) and (c). See, e.g., In re Ferrell, 580 B.R. 181, 185 (Bankr. D.S.C. 2017) (finding if a mortgage creditor fails to appear at a hearing on a Rule 3002.1(h) motion, or appears but fails to submit evidence establishing its entitlement to any postpetition amounts claimed due, "the Court may find that the alleged postpetition arrearage did not exist, or find that the mortgage creditor has waived the opportunity to claim and collect these amounts."); In re Kreidler, 494 B.R. 201, 206 (Bankr. M.D. Pa. 2013) (holding that, because it failed to appear at a hearing on a Rule 3002.1(h) motion to establish its postpetition arrearage, the mortgage creditor's postpetition arrearage was satisfied as of the date of its last statement supplementing its proof of claim); In re Rodriguez, 2013 Bankr. LEXIS 2738, at **11–12 (Bankr. S.D. Tex. 2013) (holding that, because the mortgage creditor failed to appear at the Rule 3002.1(h) hearing to support the sums claimed in its supplement, the debtors had paid all required postpetition amounts); Hollingsworth v. Option One Mortg. Corp. (In re Hollingsworth), 2012 Bankr. LEXIS 4430, at **40–42 (Bankr. N.D. Ala. 2012) (denying plaintiffs' attempted class action to enjoin mortgage servicers from "[a]ssessing and/or collecting postpetition fees from chapter 13 plaintiffs without disclosure and approval by the court" because, inter alia, "[a]n injunction would overlap and conflict with, and is therefore preempted by, new Bankruptcy Rule 3002.1").

        In Taggart, the Supreme Court held that a bankruptcy court may hold a creditor in contempt for violating a discharge order "if there is no fair ground of doubt as to whether the order barred the creditor's conduct." Taggart v. Lorenzen, No. 18-489, slip op. at 2 (U.S. June 3, 2019) (emphasis original). Debtor Current Orders, such as those entered in the Gravel and Beaulieu cases, place mortgage creditors on notice they may only collect postpetition arrears, fees, and expenses if they give proper notice of the amounts they claim due, pursuant to Rule 3002.1. See, e.g., In re Hockenberger, 2018 Bankr. LEXIS 1120, at **19–20 (Bankr. N.D. Ohio 2018) (holding the mortgage servicer "is prohibited from collecting or attempting to collect from Debtor or her property" those amounts which had "been waived and/or cured by Debtor's completion of her confirmed chapter 13 plan" as well as any other fees, charges, or expenses the creditor might assert were incurred in connection with the case); In re Ferrell, 580 B.R. 181, 188–89 (Bankr. D.S.C. 2017) (finding "[a]ny attempt by [the mortgage servicer] to collected [sic] the Disputed Amounts or any other postpetition amounts for fees, charges, and or expenses, is and shall be a willful violation of this Order and the discharge injunction of § 524 and punishable by the contempt powers of this Court."); In re Abbiehl, 2012 Bankr. LEXIS 5551, at **25–26 (Bankr. N.D. Ind. 2012) (granting Rule 3002.1(h) motion and finding "the debtors have paid in full the amount required to cure the prepetition default" and "have paid all postpetition mortgage amounts due and owing" to the creditor).

14

The Debtor Current Orders in these cases declared the respective Debtors "cured any mortgage arrearage or default existing on the date that this bankruptcy case was filed[,] … made all payments due during the pendency of this case … including all monthly payments and any other charges or amounts due under the mortgage with PHH Mortgage Corporation[,]" and "precluded [PHH] from disputing that the Debtors are current … in any other proceeding." See Gravel, no. 11-10112, doc. # 74; Beaulieu, no. 11-10281, doc. # 82. The Debtor Current Orders in each of these cases put PHH on notice it was enjoined from seeking to collect any fees or expenses allegedly incurred during the period encompassed by each Order, if not specified in the Order. Moreover, any inquiry into whether PHH was aware of its obligations under the Debtor Current Orders, and what fees and expenses it was enjoined from collecting, must take into account the fact that PHH had been sanctioned once before, in the same Gravel case, for an identical violation of Rule 3002.1 (doc. # 49). See Taggart v. Lorenzen, No. 18-489, slip op. at 7 (U.S. June 3, 2019) ("[A] party's record of continuing and persistent violations and persistent contumacy justified placing the burden of any uncertainty in the decree … on [the] shoulders' of the party who violated the court order.") (quoting McComb v. Jacksonville Paper Co., 336 U.S. 187, 192–93 (1949)). Neither the record in this case, nor the Remand Decision, indicate there was any "fair ground of doubt" that the Debtor Current Orders barred PHH from sending the incorrect notices it sent in these cases. See Taggart, slip op at 2.

Based on the findings and conclusions in the Remand Decision, as well as the Supreme Court's recent holding in Taggart, this Court finds it has authority, under its inherent powers and § 105(a), to impose punitive sanctions on PHH for its breach of the Debtor Current Orders and reviews these sanctions anew to ensure the sanction in each case is less than serious and does not exceed the limits of this Court's inherent and statutory authority.

### B. THE SCOPE OF NON–"SERIOUS" PUNITIVE SANCTIONS

The Court addresses next the lack of Second Circuit caselaw directly on point, and the Sixth and Ninth Circuits' position that bankruptcy courts may only impose mild or modest punitive sanctions (doc. # 104, p. 11).

A central issue in the rationale of the Remand Decision is the circuit split with respect to bankruptcy courts' power to impose punitive sanctions. The District Court rejected the First and Eighth Circuits' conclusion that bankruptcy courts possess the broad authority to impose punitive sanctions for violation of a court order. See In re Charbono, 790 F.3d 80, 87 (1st Cir. 2015) (finding bankruptcy courts have the same authority as other federal courts to issue punitive non-contempt sanctions for failures to comply with their orders); Isaacson v. Manty, 721 F.3d 533, 538–39 (8th Cir. 2013) (finding the bankruptcy court had inherent power, like other federal courts, to issue a punitive, non-compensatory,

15

penalty for a party's factually unsupported and harassing statements). The District Court found these interpretations of bankruptcy court authority to be too expansive and without adequate jurisprudential support. Instead, it endorsed the conclusions the Ninth, Fifth, and Sixth Circuits have reached, which "favor the narrower construction of the Bankruptcy Court's statutory and inherent punitive sanctions power" (doc. # 104, p. 16) (citing In re John Richards Homes Bldg. Co., 552 F. App'x 401, 415–16 (6th Cir. 2013); Knupfer v. Lindblade (In re Dyer), 322 F.3d 1178, 1193 (9th Cir. 2003); In re Hipp, Inc., 895 F.2d 1503, 1510 (5th Cir. 1990)). Relying on this narrower construction, the District Court held that while "the statutory and inherent powers of the Bankruptcy Court are not sufficient to support [the] imposition upon PHH of $300,000 in punitive sanctions[,] … [the Bankruptcy Court] may refer the matter to the district court" or "take steps to enforce its orders short of punitive sanctions of the scope and type imposed in these cases" (doc. # 104, p. 16–17) (emphasis added).

In effect, the District Court remanded to this Court the question of whether there are punitive sanctions that are (a) an appropriate punishment for PHH's violations, (b) within this Court's authority to impose, and (c) "short of [the] punitive sanctions of the scope and type [it previously] imposed in these cases" (doc. # 104, p. 17). Since the District Court pointed to the lack of Second Circuit authority directly on point, and signaled its support for the conclusions reached in Dyer and Richards, this Court looks to the Dyer and Richards decisions, their progeny, and the most applicable Second Circuit decisions construing the meaning of "serious sanctions," for guidance in reformulating the sanctions to be imposed on PHH.[16]

The Dyer and Richards holdings, which the District Court endorsed, do not categorically prohibit bankruptcy courts from imposing punitive sanctions under § 105(a), but rather bar them from imposing "serious" punitive sanctions (doc. # 104, p. 13–14) (citing In re Dyer, 322 F.3d at 1178; John Richards, 552 F. App'x at 415–16).[17] Similarly, the Remand Decision does not define "serious" punitive sanctions

---

[16] In favoring the "narrower construction" adopted by the Fifth, Sixth, and Ninth Circuits, and rejecting the more expansive view of the First and Eighth Circuits, the District Court found that "[t]his narrower construction is also consistent with the direction of Second Circuit precedent addressing the scope of the Bankruptcy Court's contempt authority in other contexts" (doc. # 104, p. 16). It grounds this finding in the Second Circuit case of Solow v. Kalikow (In re Kalikow), 602 F.3d 82 (2d Cir. 2010). The District Court states that while this case "is not directly controlling," it "suggests that a more limited view of the scope of the Bankruptcy Court's power to impose punitive sanctions would prevail in the Second Circuit" (doc. # 104, p. 16). With all due respect to the District Court, this Court perceives the Kalikow case to be of marginal value in predicting a Second Circuit determination of the issue at bar. In that case, the Second Circuit holds only that § 105 cannot serve as a sole or independent basis for a bankruptcy court's imposition of sanctions, instructing that § 105 authority may be invoked only if the offending party violated another provision of the Code. Id. at 97. Here, PHH violated Rule 3002.1, which implements   § 1322(b)(5) of the Bankruptcy Code.

[17] The only circuit case, of the three cited by the District Court, that can be read to categorically prohibit bankruptcy courts from imposing any amount of punitive sanctions is the Fifth Circuit's decision in In re Hipp, Inc., 895 F.2d 1503 (5th Cir. 1990). Support of this reading from within the circuit can be found in In re Rodriguez, 2007 U.S. Dist. LEXIS 11858 (W.D. Tex. 2007), where the district court vacated a bankruptcy court's $15,000 punitive fine imposed on an individual. In doing so, the court pointed to the Fifth Circuit's "rather expansive view of sanctions classifiable as criminal contempt," specifically

nor specify whether the amount of serious sanctions is determined by application of an absolute cap or on a case-by-case basis.

The <u>Richards</u> and <u>Dyer</u> decisions describe the limits of a bankruptcy court's authority to impose punitive, non-compensatory sanctions by reference to "serious" versus "mild" punitive sanctions, essentially setting the two end points of a sanctions continuum.[18] Both decisions conclude that bankruptcy courts lack the general statutory authority to impose "<u>serious</u> non-compensatory punitive damages," <u>In re John Richards Homes Bldg. Co.</u>, 552 F. App'x 401, 415 (6th Cir. 2013) (emphasis added), while conceding that bankruptcy courts do have the authority to award "<u>mild</u> non-compensatory sanctions." <u>Id.</u> (emphasis added). <u>See also</u> <u>In re Dyer</u>, 322 F.3d 1178, 1193 (9th Cir. 2003) ("Although 'relatively mild' non-compensatory fines may be necessary under some circumstances, the language of § 105(a) simply does not allow for the serious punitive penalties here assessed."). These decisions, however, do not articulate any criteria for how to recognize a mild versus serious sanction, or how to distinguish between them. In fact, they explicitly defer that question: In <u>Dyer</u>, the Ninth Circuit stated, "we leave for another day the development of a precise definition of the term 'serious' punitive (criminal) sanctions," <u>In re Dyer</u>, 322 F.3d at 1193, and in <u>Richards</u>, the Sixth Circuit affirmatively declined to decide "what defines a 'serious' non-compensatory award of punitive damages because the $2.8 million awarded below is serious under any definition." <u>In re John Richards</u>, 552 F. App'x at 416.

Similarly, the Second Circuit has recognized but not answered the question of the extent of a bankruptcy court's authority to impose punitive sanctions under either its inherent power or § 105(a) of the Bankruptcy Code. In the <u>Guariglia</u> case, for example, the Second Circuit identified, and then deferred addressing that crucial subject: "We note also that there is a serious question as to whether the bankruptcy court would have had the authority to punish Guariglia for criminal contempt of its Order had the government first sought a determination by the bankruptcy court. We need not resolve this issue …" <u>United States v. Guariglia</u>, 962 F.2d 160, 163 (2d Cir. 1992) (internal citations omitted). There are, however, other Second Circuit cases, albeit unrelated to bankruptcy disputes, which provide meaningful insight into how the Second Circuit might circumscribe the scope of "serious sanctions."

To begin with, the Second Circuit has decided several cases focused on the notice requirements and enunciated the due process prerequisite for imposing punitive sanctions. It held the same notice is

---

circuit cases "holding that a fine of as little as $500 for failure to appear constitutes criminal contempt." <u>Id.</u> at **43–45. <u>But see</u> <u>Kamatani v. BenQ Corp.</u>, 2005 U.S. Dist. LEXIS 42762, at *46 (E.D. Tex. 2005) (imposing a "modest" $500,000 contempt sanction under its inherent powers without characterizing it as criminal contempt).

[18] The <u>Richards</u> court writes that, in addition to the Ninth Circuit, the Fifth Circuit "allow[s] bankruptcy courts to award relatively minor noncompensatory fines." <u>In re John Richards Homes Bldg. Co.</u>, 552 F. App'x 401, 415 (6th Cir. 2013) (citing <u>In re Hipp, Inc.</u>, 895 F.2d 1503, 1509–21 (5th Cir. 1990)). By contrast, the <u>Hipp</u> decision does not include language allowing for that possibility or recognizing the inherent power of bankruptcy courts to impose even non-serious punitive sanctions.

required whether the sanction to be imposed arises from a rule violation or a finding of contempt. See

Satcorp Int'l Group v. China Nat'l Silk Import & Export Corp., 101 F.3d 3, 5 (2d Cir. 1996) ("Regardless

of whether a sanction is premised on a finding of contempt, or is deemed justified under Rule 37

generally, the same amount of due process is due … A district court cannot circumvent this mandate by

choosing to characterize the sanction as something other than 'contempt.'").[19]

Building on those notice requirements, the Second Circuit has held that while punitive damages

are not inextricably linked to criminal contempt, a party facing substantial punitive sanctions is entitled to

the same protections as a party threatened with criminal contempt:

> … the consequences of an adjudication of criminal contempt are different from
> those flowing from the imposition of sanctions. The person found guilty of criminal
> contempt, unlike a person on whom sanctions have been imposed, now carries a
> criminal conviction on his record. Furthermore, possible punishments for contempt,
> unlike sanctions, include imprisonment.
>   Nevertheless, sanctions and contempt raise certain similar concerns. Whether or not
> a finding of contempt is involved, unfairness and abuse are possible, especially if
> courts were to operate without any framework of rules or cap on their power to
> punish. In either case, the individual bears the risk of substantial punishment by
> reason of obstructive or disobedient conduct, as well as of vindictive pursuit by an
> offended judge. We conclude, notwithstanding the differences mentioned above, that
> the imposition of a sufficiently substantial punitive sanction requires that the person
> sanctioned receive the procedural protections appropriate to a criminal case.
>   We conclude that the imposition of a $10,000 punitive sanction on an individual (as
> opposed to a corporation or collective entity) requires such protections.

Mackler Prods., Inc. v. Cohen, 146 F.3d 126, 129–30 (2d Cir. 1998) [hereinafter Mackler I] (emphasis

added). Interestingly, in a footnote to this section of the decision, the Second Circuit points out it "[did]

not address a court's ability to levy a modest punitive sanction without the protections of criminal

procedure." Id. at 130 n. 2 (emphasis added). This sanctions analysis in Mackler is important to the issues

at bar because the Second Circuit distinguishes there between "a sufficiently substantial punitive

sanction" and something less than that, as well as between a sanction imposed on an individual and a

sanction imposed on "a corporation or collective entity." This suggests that a sanction it might classify as

"serious" if imposed on an individual, could well fall into the category of "modest" if imposed on a

corporation. Mackler I, 146 F.3d at 130. The gap, for purposes of the instant cases, is that the Second

Circuit did not articulate what sanction amount would have triggered the need for these protections (or

been "serious") if the target of the sanction had been a corporation.[20]

---

[19] The Second Circuit has also recognized, however, "that the requirements of due process cannot be cabined within an inflexible regime, and must vary with each case." Reilly v. Natwest Markets Group Inc., 181 F.3d 253, 270 (2d Cir. 1999). Specifically, "in the Rule 37 context," which served as a model for Bankruptcy Rule 3002.1, the Reilly court "declined to impose rigid requirements on either the timing or the form of the notice afforded to a sanctioned party." Id.
[20] The $10,000 sanction, which was imposed on an individual and triggered the need for procedural protections in June of

Taken together, the <u>Satcorp</u> and <u>Mackler</u> cases erect guideposts one could reasonably expect the Second Circuit to follow when determining whether a particular punitive sanction on a corporation is serious or modest. This Court will follow these guideposts in reformulating the sanctions against PHH, to ensure the sanctions do not fall into the "serious" category. <u>Mackler I</u>, 146 F.3d at 130; <u>Mackler Prods. v. Cohen</u>, 225 F.3d 136, 142 (2d Cir. 2000) [hereinafter <u>Mackler II</u>]. To better ascertain the parameters of that category, the Court turns to the caselaw describing the sanctions that have been categorized as less than serious.

C. <span style="font-variant:small-caps">The Scope of "Non-Serious" or "Modest" Sanctions on a Corporation</span>

In 1993, the Supreme Court considered and declined to answer "the difficult question where the line between petty and serious contempt fines should be drawn." <u>Int'l Union v. Bagwell</u>, 512 U.S. 821, 837 n. 5 (1994). It discussed a previous decision finding a fine of $10,000 imposed on a union "was insufficient to trigger the Sixth Amendment right to jury trial." <u>Id.</u> (citing <u>Muniz v. Hoffman</u>, 422 U.S. 454, 477 (1975)). The <u>Bagwell</u> Court did not find it necessary to create a bright-line rule "since the $52 million fine [imposed in the case] unquestionably is a serious contempt sanction." <u>Id.</u>[21]

While the <u>Mackler</u> cases, described above, are quite helpful in describing the contours of a "substantial punitive sanction" against an individual, <u>Mackler II</u>, 225 F.3d at 142, the Second Circuit Court of Appeals has not specified – there or elsewhere – where the line is between a substantial and a modest punitive sanction, against a corporation. Therefore, this Court attempts to discern the contours of a "modest sanction" by examining (1) Second Circuit decisions that discuss "modest" and "serious" sanctions, and (2) the caselaw that has emerged from the <u>Richards</u> and <u>Dyer</u> decisions, upon which the District Court relied in the Remand Decision (doc. # 104, p. 13–14). The Court will also examine whether a sanctioned party's wealth and ability to pay should be considered in the determination of whether a given sanction is "serious" or "modest."

1. *Second Circuit Guidance re the Scope of "Modest" and "Serious" Sanctions on a Corporation*

a)     <i>Second Circuit Guidance on "Modest" Sanctions</i>

While not controlling, the <u>Mackler</u> decisions offer valuable insight into the Second Circuit's approach to discerning the scope and definition of "modest" punitive sanctions. Following the remand in

---

1998, would correspond to $15,711.17 in 2019 dollars. <u>See</u> United States Bureau of Labor Statistics, <u>CPI Inflation Calculator</u>, available at https://www.bls.gov/data/inflation_calculator.htm (last visited June 24, 2019) (hereinafter CPI Inflation Calculator). In adjusting a given sanction amount to its 2019 equivalent value, this Court relies upon the Bureau of Labor Statistics' Consumer Price Index (CPI) Inflation Calculator, the same tool utilized by the Supreme Court and the Second Circuit Court of Appeals. <u>See, e.g.</u>, <u>Janus v. AFSCME, Council 31</u>, 138 S. Ct. 2448, 2483 (2018); <u>Falzon v. JPMorgan Chase & Co.</u>, 501 Fed. Appx. 92, 94 n. 1 (2d Cir. 2012).
[21] The apparently modest $10,000 sanction, in the <u>Muniz</u> case to which the Supreme Court referred, was imposed in 1975 and would correspond to $27,611.94 in 1994 dollars – far shy of $52 million; it would amount to $47,778.36 in 2019 dollars. <u>See</u> CPI Inflation Calculator, <u>supra</u> note 20.

19

Mackler I, the district court lowered the punitive component of the sanction from $10,000 to $2,000.[22]

The sanctioned individual appealed and, in Mackler II, the Second Circuit determined that, "when viewed in light of the other relevant factors, the $2,000 'punitive' sanction at issue in this case could not be imposed without [the protections of criminal procedure]" and therefore was not a "modest" punitive sanction.[23] Mackler Prods. v. Cohen, 225 F.3d 136, 143 n. 3 (2d Cir. 2000). The "other relevant factors" alluded to in Mackler II, beyond the size of the sanction, include:

> whether the sanction is intended to be compensatory or punitive; whether it is payable to the court or to the injured party; whether it is based on past wrongful conduct or is intended to coerce future compliance; and whether any opportunity to purge the sanction is provided.

Id. at 142. While the Mackler II decision provides vital insight into the Second Circuit's view of punitive sanctions, there are some crucial factual distinctions in the case at bar that persuade this Court that its $2,000 cap does not control.

Of most significance, the party being sanctioned in Mackler was "a 78-year-old lawyer with an apparently unblemished record" until the sanctionable conduct at issue. Id. at 143. PHH, by contrast, is an active multi-billion dollar corporate entity, touting itself as "one of the largest subservicers of residential mortgages in the United States,"[24] with a total servicing portfolio, as of its most recent public earnings release, comprised of nearly 586,609 loans representing $129 billion of unpaid principal balance.[25] At least one court within the Second Circuit has differentiated between the heightened procedural requirements described as necessary in Mackler, where the sanctioned party was an individual, on the one hand, and instances in which the sanctioned party is a corporation, on the other. See New Pac. Overseas Group (USA) Inc. v. Excal Int'l Dev. Corp. 2000 U.S. Dist. LEXIS 4695, at **14, 17 (S.D.N.Y. 2000) (distinguishing Mackler court's heightened procedural protections for "proceedings where punitive sanctions were being considered against an individual" from the $10,000 additional sanction "imposed on a corporation, and not on an individual.").

In contrast to the attorney sanctioned in the Mackler cases, who had no history of misconduct in the courts, PHH has been sanctioned for the same conduct at least once before and continued to transgress the rules and orders in question. This Court imposed a punitive sanction of $9,000 on PHH in 2014, in the

---

[22] It left all other components of the sanction unchanged for reasons inapplicable to this analysis.

[23] A sanction of $2,000.00 in 2000 dollars is the equivalent of $2,964.03 in 2019 dollars. See CPI Inflation Calculator, supra note 20.

[24] Company Overview, PHH Corporation, http://corporate.phh.com/phoenix.zhtml?c=187859&p=irol-media (last visited June 24, 2019, 9:35 a.m.).

[25] Press Release, PHH Corporation, PHH Corporation Announces Second Quarter 2018 Results, (Aug. 3, 2018), http://corporate.phh.com/Phoenix.zhtml?c=187859&p=irol-news.

Gravel case (doc. # 49).[26] Additionally, PHH was admonished by another bankruptcy court for identical violations, see In re Owens, 2014 Bankr. LEXIS 163 (Bankr. W.D.N.C. 2014), prior to its documented transgressions in this Court. Hence, sanctions in an amount larger than $9,000 are necessary to "coerce future compliance" with this Court's Debtor Current Orders and federal and local bankruptcy rules. Mackler Prods. v. Cohen, 225 F.3d 136, 142 (2d Cir. 2000). See Jones v. Wells Fargo Home Mortg., Inc. (In re Jones), 2012 Bankr. LEXIS 1450 (Bankr. E.D. La. 2012) (citing previous sanctions assessed against corporate bank, which "have not deterred Wells Fargo[,]" in awarding a larger punitive damage award of $3,171,154 "to deter Wells Fargo from similar conduct in the future"); Nowlin v. RNR, LLC, 2009 Bankr. LEXIS 2586, at **18–19 (Bankr. M.D. Tenn. 2009) (acknowledging its prior sanction, the third imposed against the corporate creditor, "had absolutely no deterrent effect[,]" chastising that creditor's "recidivism," and imposing a $25,000 punitive sanction to "ensure [the creditor's] compliance with the bankruptcy rules, code and this court's order"); Kamatani v. BenQ Corp., 2005 U.S. Dist. LEXIS 42762 (E.D. Tex. 2005) (imposing $500,000 punitive sanction on corporation where lesser sanctions it previously imposed on two separate occasions "failed to correct [the party's] behavior …").[27]

Based on this analysis of Mackler, and taking into account the different nature of the sanctioned party (multi-billion dollar corporation rather than individual attorney), and PHH's status as a repeat offender (having already been sanctioned by this Court in the amount of $9,000), this Court imposes herein sanctions it anticipates the Second Circuit would label as "modest," and the District Court would find to be "less than serious."

> b)      *Second Circuit Guidance on "Serious" Sanctions*

At the other end of the spectrum, the Second Circuit has drawn a bright-line rule for an "absolute dollar amount of fines above which, it holds, the Sixth Amendment entitles a corporation to a jury trial for criminal contempts, regardless of the contemnor's financial resources," thus demarcating what constitutes a serious sanction. United States v. Twentieth Century Fox Film Corp., 882 F.2d 656, 663 (2d Cir. 1989).

---

[26] At the hearing on approval of that stipulated sanction, PHH asked the Court to authorize a "small sanction" to provide the Court additional room to impose a higher sanction if PHH failed to correct its procedures and comply with Rule 3002.1 and Court Orders going forward. The Court advised PHH that it imposed sanctions with the intent the sanction would be sufficient to deter misconduct – without need for subsequent, harsher penalties. See doc. ## 47, 48 for audio of the hearing held on March 21, 2014.

[27] The Southern District of New York's decision in the New Pacific case illustrates this point well. There, the district court applied the Mackler factors and then explicitly imposed punitive sanctions intended to both punish past conduct and coerce future compliance. New Pac. Overseas Group (USA) Inc. v. Excal Int'l Dev. Corp. 2000 U.S. Dist. LEXIS 4695 (S.D.N.Y. 2000). After considering New Pacific's intransigence during the discovery process, particularly its blocking of any inspection of critical equipment, which persisted despite clear court instructions to make the equipment available, it imposed a $10,000 sanction on the corporate plaintiff and stated that the sanction was both "for [that plaintiff's] failure to comply with a Court Order to permit the defendants to inspect [the manufacturing equipment]" and "to ensure [that plaintiff's] future compliance with court orders and cooperation in discovery." Id. at **1, 15.

In the Twentieth Century Fox case, the Second Circuit pronounced the triggering amount for Sixth Amendment protections: "We conclude that the jury right is available for a criminal contempt whenever the fine imposed on an organization exceeds $100,000." Id. at 665. It reiterated the existence and significance of this defined cap in 2000, when it stated, "On occasion, this Court has also adopted a bright-line standard. Considering the amount of a fine that could be imposed on an organization for criminal contempt without a jury trial, we set the amount at $100,000." Colon v. Howard, 215 F.3d 227, 233 (2d Cir. 2000).[28]

        The establishment of a triggering amount of a sanction or fine in Twentieth Century Fox, when imposed on a corporation and upon which a jury trial is required, is a critical factor in determining what constitutes a "serious" punitive sanction in the Second Circuit. The Ninth Circuit employs a similar analytical approach by analogizing the amount at which a fine or sanction triggers an individual's right to a jury trial to the amount at which a punitive sanction is "serious." Knupfer v. Lindblade (In re Dyer), 322 F.3d 1178, 1193 (9th Cir. 2003). In considering what constitutes a "serious" punitive sanction, the Dyer court cited a prior Ninth Circuit decision, which implied that "any fine above $5,000, 'at least in 1998 dollars,' would be serious[.]" Id. (citing F.J. Hanshaw Enters. v. Emerald River Dev., Inc., 244 F.3d 1128, 1139 n. 10 (9th Cir. 2001)). The $5,000 figure to which Hanshaw refers has its genesis in a 1989 Supreme Court case,[29] which involved a potential "cutoff for a serious fine warranting a jury trial," in the case of two individuals convicted of driving under the influence. See Hanshaw, 244 F.3d at 1139 n. 10 (citing Blanton v. City of N. Las Vegas, 489 U.S. 538 (1989)).

        With the pronouncement from the Second Circuit in the Twentieth Century Fox case, that $100,000 (in 1989 dollars) is the cap where criminal protections are required for a sanctioned corporation, combined with its explanation in Mackler that the definition of a serious sanction for an individual is different from that applicable to a corporation, this Court concludes the cap that would justify characterizing a civil punitive sanction as "serious" would likewise apply to set the line above which criminal protections are required. That persuades this Court that a sanction of less than $205,531.30 i.e., the same sanction imposed in Twentieth Century Fox, in 1989, translated into 2019 dollars, would be less than a "serious" punitive sanction, against a corporation, in the Second Circuit.

_____

[28] This sum of $100,000, in 1989 dollars, equals $205,531.30 in 2019 dollars. See CPI Inflation Calculator, supra note 20.

[29] The Dyer court quoted the Ninth Circuit's decision in F.J. Hanshaw Enters. v. Emerald River Dev., Inc., 244 F.3d 1128 (9th Cir. 2001) as favorably citing cases implying that "any fine above $5,000, 'at least in 1998 dollars,' would be serious, but declining to answer the question." Knupfer v. Lindblad (In re Dyer), 332 F.3d 1178, 1193 (9th Cir. 2003). However, the Hanshaw decision cites cases implying that any fine above $5,000, "at least in 1989 dollars," would be the cutoff for a serious fine warranting a jury trial. 244 F.3d at 1139 n. 10 (citing Blanton v. N. Las Vegas, 489 U.S. 538 (1989)) (emphasis added). To avoid confusion, incorrect citations to Hanshaw will be noted as such in this Memorandum of Decision, to emphasize that the year cited by Hanshaw was 1989, not 1998 as stated in Dyer.

2.   ***Richards & Dyer*** *Guidance re the Scope of "Modest" and "Serious" Sanctions on a Corporation*

Since the District Court cited favorably the rationale set forth in the <u>Richards</u> and <u>Dyer</u> cases in explaining its views on the bankruptcy court's authority to impose punitive sanctions (doc. # 104, p. 16, <u>citing</u> In re John Richards Homes Bldg. Co., 552 F. App'x 401, 415–16 (6th Cir. 2013), In re Dyer, 322 F.3d 1178, 1193 (9th Cir. 2003)), this Court will also scrutinize how the <u>Richards</u> and <u>Dyer</u> courts defined "serious" or "mild" punitive sanctions, and whether any further refinement of those terms has emerged from within those circuits since those two decisions were issued.

*a)      Guidance from <u>Richards</u> and its Progeny*

The Sixth Circuit issued <u>Richards</u> in late 2013, as an unpublished decision, to review a bankruptcy court's imposition of a $2.8 million sanction on an individual. <u>In re John Richards Homes Bldg. Co., L.L.C.</u>, 552 F. App'x 401 (6th Cir. 2013). The Sixth Circuit held that "bankruptcy courts lack the statutory authority to impose serious noncompensatory punitive damages" but refrained from defining what damages would be considered serious because "the $2.8 million awarded below [against an individual] is serious under any definition." <u>Id.</u> at 416. It also held bankruptcy courts have "the authority to award mild noncompensatory punitive damages," but did not define the limits of a "mild noncompensatory sanction." <u>Id.</u> at 415.

Since <u>Richards</u>, only one decision has been issued in the Sixth Circuit that attempts to define categories of sanctions. <u>See</u> In Cook v. Franklin Credit Mgmt. Corp. (In re Cook), 2015 Bankr. LEXIS 1258 (Bankr. M.D. Tenn. 2015), <u>aff'd sub nom.</u> Franklin Credit Mgmt. Corp. v. Cook, 551 B.R. 613 (M.D. Tenn. 2016). In the <u>Cook</u> case, the bankruptcy court had imposed a $5,000 sanction on a corporate defendant that it labeled as a "mild sanction," under § 105(a), based on the offending party's failure to comply with an order to correct erroneous entries on the debtors' credit reports and its violation both the Discharge Order and Debtor Current Order in the case. <u>In re Cook</u>, 2015 Bankr. LEXIS 1258, at **2, 6. The bankruptcy court had also (a) extinguished the $4,624 debt the debtors owed to the offending creditor, and (b) required the creditor to pay compensatory damages of over $31,000 to reimburse each of the joint-debtors for lost wages, and pay all court costs and attorney's fees. The bankruptcy court appears to have based its categorization of the sanction as "mild" by reference to the statement in <u>Richards</u>, that "[a] $5,000 sanction is not considered a serious punitive sanction." <u>Id.</u> at *7 n. 1 (quoting In re John Richards Homes Bldg. Co., L.L.C., 552 F. App'x 401, 415 (6th Cir. 2013)), and the district court affirmed that rationale. <u>Franklin Credit Mgmt. Corp. v. Cook</u>, 551 B.R. 613, 625 (M.D. Tenn. 2016). Hence, the only guidance from the Sixth Circuit to date appears to be that a sanction against a corporation in the amount of $5,000 is "mild" and a sanction against an individual in the amount of $2.8 million is "serious."

23

*b)*     *Guidance from <u>Dyer</u> and its Progeny*

The Ninth Circuit's decision in <u>Dyer</u> considered the appropriateness of the bankruptcy court's imposition of punitive sanctions, under § 105(a) and, as in <u>Richards</u>, reviewed the propriety of that sanction against an individual. <u>Knupfer v. Lindblade (In re Dyer)</u>, 322 F.3d 1178 (9th Cir. 2003). The <u>Dyer</u> court found § 105(a) "simply does not allow for the <u>serious</u> punitive penalties here assessed (a minimum of $50,000 and, under the trustee's theory, over $200,000)," but "[left] for another day the development of a precise definition of the term 'serious' punitive (criminal) sanctions." <u>Id.</u> at 1193 (emphasis added). The <u>Dyer</u> court held that "relatively mild" noncompensatory fines may be necessary under some circumstances, but the only indication of how large a "relatively mild sanction" might be, in the assessment of the Ninth Circuit, is the <u>Dyer</u> court's reference to a 2001 Ninth Circuit case which, while not reaching the question directly, pointed to cases "implying any fine above $5,000, 'at least in 1989 dollars,'[30] would be serious[.]"<u>Id.</u> (citing <u>F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.</u>, 244 F.3d 1128, 1140 n. 10 (9th Cir. 2001), which in turn cited other cases that shared that perspective).[31]

Since the Ninth Circuit issued <u>Dyer</u> in 2003, courts within the Ninth Circuit appear to have applied its definition of "mild" noncompensatory sanctions with some trepidation. <u>See, e.g.</u>, <u>In re Vanamann</u>, 561 B.R. 106, 131 (Bankr. D. Nev. 2016) ("Nationstar's business decision resulted in actual damage to the Debtor and warrants, at a minimum, a mildly, non-compensatory fine of $5,000 that must be paid to the Debtor."). Some courts have ruled that the <u>Dyer</u> $5,000 cap may be adjusted to account for inflation. <u>See</u> <u>Ocwen Loan Servicing, LLC v. Marino (In re Marino)</u>, 577 B.R. 772, 789 n. 12 (B.A.P. 9th Cir. 2017) ("The Ninth Circuit left open the question of what is a 'serious' punitive sanction but implied that any fine above $5,000 (presumably in 1989 dollars) would be considered serious."); <u>Rosales v. Wallace (In re Wallace)</u>, 2012 Bankr. LEXIS 2934, at *24 (B.A.P. 9th Cir. 2012) (finding the <u>Dyer</u> court "implied that any fine above $5,000 (presumably in 1989 dollars) would be considered serious."). At least one district court has held that in determining whether a sanction imposed by a bankruptcy court exceeds the <u>Dyer</u> $5,000 cap, the amount of that cap must first be adjusted for inflation. In that decision, the Hawaii District Court affirmed "that a $9,000 fine in today's dollars would be less than the $5,000 fine in 1998 [sic][32]

---

[30] The sum of $5,000 in 1989 dollars equals $10,469.83 in 2019 dollars. <u>See</u> CPI Inflation Calculator, <u>supra</u> note 20.

[31] For example, the <u>Hanshaw</u> court pointed to the Fifth Circuit's 1998 conclusion that "$75,000 is manifestly non-petty in the case of an individual, just as $5 million is non-petty in the case of a corporation" and remarking that, in 1994, the Supreme Court in the <u>Bagwell</u> case had "strongly suggested, without deciding, that $5,000 was an appropriate limit for individuals, and $10,000 for corporations." <u>Crowe v. Smith</u>, 151 F.3d 217, 228 n. 13 (5th Cir. 1998).

[32] In stating that prior Ninth Circuit decisions implied any fine over $5,000, "at least in 1998 dollars," could be considered serious, the <u>Dyer</u> court inaccurately cited the case relied upon for that proposition. <u>See supra</u> note 29. In <u>Himmelfarb</u>, this inaccuracy went uncorrected by the district court, but did not affect its decision. <u>In re Himmelfarb</u>, 2014 U.S. Dist. LEXIS 164462, at **28–29 (D. Haw. 2014). The bankruptcy court, which originally issued the sanction, had already detected and corrected the error from <u>Dyer</u>, and based its inflation-adjusted sanction on the correct year of 1989, <u>In re Himmelfarb</u>, 2014 Bankr. LEXIS 2916 (Bankr. D. Haw. 2014), which the district court then upheld.

dollars" and that "the $9,000 fine does not appear to be a 'serious' punitive penalty that the bankruptcy court lacked the power to impose, under the guidance given in <u>Dyer</u>." <u>In re Himmelfarb</u>, 2014 U.S. Dist. LEXIS 164462, at **28–29 (D. Haw. 2014).

In 2015, the Ninth Circuit Bankruptcy Appellate Panel ("BAP") applied the <u>Dyer</u> and <u>Hanshaw</u> criteria to determine whether a particular sanction was "serious" by analyzing the amount of the sanction in light of the financial condition of the sanctioned party. <u>Faden v. Segal (In re Segal)</u>, 2015 Bankr. LEXIS 286, at *30 (B.A.P. 9th Cir. 2015). In the <u>Segal</u> case, the BAP reviewed the sanction a bankruptcy court had imposed on an individual and, referring back to <u>Dyer</u>, observed that bankruptcy courts may impose "'relatively mild' non-compensatory fines … when there is no other practicable means of addressing the contumacious conduct." <u>Id.</u> at *22. With respect to the amount of such sanctions, it held that "under no circumstances should the relatively mild non-compensatory fine exceed several thousand dollars." <u>Id.</u> The BAP remanded the case to the bankruptcy court, in part, because the bankruptcy court had not made any findings with respect to the offending person's financial condition. It reiterated the <u>Hanshaw</u> determination, "the seriousness of the sanction award depends in part on whether the sanctioned party is a multinational corporation, an impoverished debtor, or something in between." <u>Id.</u> at *30 (citing <u>F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.</u>, 244 F.3d 1128, 1140 n. 10 (9th Cir. 2001)). This was consistent with the way in which bankruptcy courts within the Ninth Circuit had been applying the <u>Dyer</u> criteria. For example, in <u>In re Grihalva</u>, 2013 Bankr. LEXIS 4057 (Bankr. D. Nev. 2013), the bankruptcy court acknowledged it was limited to applying "relatively mild non-compensatory fines rather than serious punitive penalties[,]" acknowledged the $5,000 cap set by <u>Dyer</u>, and then sanctioned a mortgage servicer $10,000 – twice the amount the <u>Dyer</u> court had set for a mild sanction on an individual. <u>Id.</u> at **21–23.

These interpretations of, and extrapolations from, the <u>Dyer</u> and <u>Richards</u> cases persuade this Court that while these Ninth and Sixth Circuit cases do limit the sanctioning authority of bankruptcy courts to "mild" sanctions, they, first, allow bankruptcy courts to exercise discretion and consider the financial resources of the offending party in computing what would be a mild sanction against a corporation and, second, permit the bankruptcy court imposing the sanction to convert the applicable dollar amount cap to its present value.

### 3.  *The Offending Party's Wealth and Ability to Pay*
### *as a Factor in Determining if a Sanction on a Corporation is "Serious"*

Deterrence is a key purpose sanctions are intended to serve. <u>See</u> <u>Roadway Express Inc., v. Piper</u>, 447 U.S. 752, 764 (1980) (noting that sanctions must be applied "to deter those who might be tempted to such conduct in the absence of such a deterrent"). In order to effectively deter inappropriate conduct

across the full range of potential violators, courts must have the flexibility to tailor the amount of sanctions to account for factors such as the nature of the rule that was breached, the degree of the breach, whether there have been multiple breaches of the same rule and, importantly, the financial resources of the sanctioned party. See Thomas Koenig & Michael Rustad, Crimtorts as Corporate Just Deserts, 31 U. MICH. J.L. REFORM 289, 328 (1998) ("Nearly every American jurisdiction that recognizes punitive damages permits evidence of financial standing to be considered in order to ensure that the award is large enough to deter the wrongdoer.").

        Many courts have recognized that sanctioning a large corporation may require a more substantial sanction than one imposed on an individual, to achieve a meaningful degree of deterrence. "It is not uncommon for large corporations with vast resources to impede the discovery process … Courts must be vigilant to prevent that type of conduct when it occurs and must impose meaningful sanctions to protect the integrity of the proceedings before it." In re Prudential Ins. Co. of Am. Sales Practices Litig., 169 F.R.D. 598, 617 n. 15 (D. N.J. 1997). For example, in Nycomed, the district court in the Eastern District of New York considered a sanction against a corporation in an amount that Mackler had deemed to be "sufficiently substantial" to require heightened criminal procedure protections, if it were imposed on an individual. See Mackler Prods., Inc. v. Cohen, 146 F.3d 126, 130 (2d Cir. 1998). However, the Nycomed court found being limited by the Mackler cap of $10,000 would result in a sanction insufficient to accomplish even a modicum of deterrence: "Glenmark is a substantial multinational corporation, and a more modest fine of $10,000 or $20,000 would amount to a proverbial slap on the wrist." Nycomed U.S. Inc. v. Glenmark Generics Ltd., 2010 U.S. Dist. LEXIS 82014, at **39–40 (E.D.N.Y. 2010). Similarly, in In re Brown, 319 B.R. 876 (Bankr. N.D. Ill. 2005), the bankruptcy court considered what amount would deter the offending mortgage servicer, and others, from careless mistakes leading to false pleadings, astutely inquiring, "At what dollar sanction will the company executives take a hand and order more careful procedures?" Id. at 882. It imposed a $10,000 sanction, observed that EMC Mortgage Corporation "is a major financial company, and is clearly able to pay a $10,000 sanction," id., and cautioned that this amount may still not provide sufficient deterrence. The order the bankruptcy court entered addressed that potential eventuality by retaining jurisdiction "to impose an additional sanction for disobedience of the Court order" if EMC did not pay the sanction within 21 days. Id. The court noted that, "[w]hen a company like EMC administers millions of dollars in mortgages every day, it is all too easy to pay a $10,000 sanction as a cost of doing business, and there is no way of selecting a specific amount that will necessarily deter." Id. This is precisely the conundrum this Court faces in trying to fashion a sufficient sanction against PHH. Like EMC, PHH administers millions of dollars in mortgages every day, and therefore "it is all too easy for it to pay a $10,000 sanction as a cost of doing business, and there is no way

of selecting a specific amount that will <u>necessarily deter</u>." <u>Id.</u> (emphasis added). Here, the sanctions must be sufficient to deter PHH from continuing to issue statements to debtors which violate Rule 3002.1. Since the record demonstrates a $9,000 sanction was ineffective to deter PHH from continuing to engage in that misconduct, it appears unlikely that sanctions of $10,000 will be adequate to deter PHH from continuing that misconduct going forward.

Some courts have imposed a sanction in excess of $10,000 against a corporation and characterized the sanction as "modest." For example, in <u>Kamatani</u>, after two prior sanctions against the offending corporation did not end the punished conduct, the district court imposed an inherent power monetary sanction of $500,000, in addition to the attorney's fees and costs it imposed for Rule 37 violations. <u>Kamatani v. BenQ Corp.</u>, 2005 U.S. Dist. LEXIS 42762, at *46 (E.D. Tex. 2005). In consideration of the "hundreds of millions of dollars" generated by the company through its alleged patent infringement, the Court classified the $500,000 sanction as a "modest" sanction. <u>Id.</u>[33] <u>See also</u> <u>Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.</u>, 793 F.2d 1529, 1535 (11th Cir. 1986) (characterizing a $25,000 contempt sanction imposed against corporate restaurant chain as "a modest sanction."[34]).

There are indications the Second Circuit shares the Ninth Circuit's perspective that a sanctioned party's wealth and ability to pay should play some role in a court's determination of an appropriate sanction. In <u>Shangold v. Walt Disney Co.</u>, 275 Fed. Appx. 72 (2d Cir. 2008), the Second Circuit "noted … that fee awards are at bottom an equitable matter, and courts should not hesitate to take the relative wealth of the parties into account." <u>Id.</u> at 74 (internal quotation omitted). Citing that passage from <u>Disney</u>, the <u>Nycomed</u> court flatly stated, "[i]n determining the amount of an appropriate sanction, the Court is permitted to consider … the resources of the sanctioned party." <u>Nycomed U.S. Inc. v. Glenmark Generics Ltd.</u>, 2010 U.S. Dist. LEXIS 82014, at *39 (E.D.N.Y. 2010). <u>See also</u> <u>Oliveri v. Thompson</u>, 803 F.3d 1265, 1281 (2d Cir. 1986) ("[G]iven the underlying purpose of sanctions – to punish deviations from proper standards of conduct with a view toward encouraging future compliance and deterring future violations – it lies well within the district court's discretion to temper the amount to be awarded against an offending party by a balancing consideration of his ability to pay.")

In the <u>Mackler</u> cases, the Second Circuit implicitly endorsed the same principle by limiting its finding on the seriousness of the punitive sanction at issue there (first a $10,000 sanction and then a $2,000 sanction) to cases in which the sanctioned party was an individual, and not a corporation. <u>Mackler Prods., Inc. v. Cohen</u>, 146 F.3d 126, 130 (2d Cir. 1998) (finding $10,000 punitive sanction imposed "on

---

[33] A sanction of $500,000 in 2005 dollars is the equivalent of $642,801.20 in 2019 dollars. <u>See</u> CPI Inflation Calculator, <u>supra</u> note 20.

[34] This sum of $25,000, in 1986 dollars, equals $58,468.49 in 2019 dollars. <u>See</u> CPI Inflation Calculator, <u>supra</u> note 20.

an individual (<u>as opposed to a corporation or collective entity</u>)" is a "sufficiently substantial punitive sanction" requiring criminal procedural protections) (emphasis added). In sanctioning a corporation, the Second Circuit has explicitly stated a corporation's financial resources must be considered in determining whether the punishment is "serious." In <u>Twentieth Century Fox</u>, which established the $100,000 amount that triggers a corporation's right to a jury trial, the Second Circuit held that "[f]or fines below the $100,000 threshold, it will remain appropriate to consider whether the fine has such a significant financial impact upon a particular organization as to indicate that the punishment is for a serious offense, requiring a jury trial." <u>United States v. Twentieth Century Fox Film Corp.</u>, 882 F.2d 656, 665 (2d Cir. 1989).

More recently, the Second Circuit has adjusted the size of a sanction based on the financial resources of a sanctioned corporation. <u>See, e.g.</u>, <u>CBS Broad. Inc. v. FilmOn.com, Inc.</u>, 814 F.3d 91, 103–104 (2d Cir. 2016) (finding a $90,000 sanction imposed against internet company to be "a relatively minor amount which is not large enough to warrant concern with the adjudication process.") (internal citation omitted); <u>see also</u> <u>Musidor B.V. v. Great American Screen</u>, 658 F.2d 60, 66 (2d Cir. 1981) (finding that imposition of a $10,000 fine against T-shirt printer, which had "gross revenues of $60,000 to $75,000" from the sale of the shirts at a single venue, did not deprive the company of a constitutional right, at least where it never made any request for a jury trial); <u>Passlogix, Inc. v. 2FA Tech., LLC</u>, 708 F. Supp. 2d 378 (S.D.N.Y. 2010) (imposing a $10,000 sanction against company, payable to the court, based on the party's "litigation conduct" and "its status as a small corporation"); <u>In re Haemmerle</u>, 529 B.R. 17, 31 (Bankr. E.D.N.Y. 2015) (finding a $69,500 sanction imposed against a large mortgage creditor was "proper and reasonable" after that creditor attempted to collect a debt that had been discharged in an individual's chapter 7 case.)

Based on this body of fairly well-developed, sanctions-focused jurisprudence from the Second Circuit, this Court finds it is appropriate and fair to consider PHH's financial resources in revisiting the question of what sanctions to impose on PHH.

### D. THE NEW SANCTION ON PHH IN EACH OF THESE CASES

As directed in the Remand Decision, this Court issues this decision to impose sanctions on PHH that "are short of punitive sanctions of the scope and type [it] imposed [in its original Sanctions Decision] in these cases" (doc. # 104, p. 17).

The first step is confirmation of the authority of a bankruptcy court to impose punitive sanctions on parties who violate court orders, under either its inherent powers or § 105 of the Bankruptcy Code. This authority is confirmed in the Supreme Court's recent decision on that point. <u>Taggart v. Lorenzen</u>, No. 18-489 (U.S. June 3, 2019). In <u>Taggart</u>, the high court ruled a bankruptcy court may hold a creditor in contempt for that party's violation of an injunction order, and impose sanctions, including punitive

28

sanctions,[35] if, using an objective standard, the court finds "there is not a 'fair ground of doubt' as to whether the creditor's conduct might be lawful under the order." Taggart, slip op. at 10. This Court has already found, and the District Court has not set aside the finding, that PHH acted in violation of the Debtor Current Orders in the Gravel and Beaulieu cases. Thus, there is no fair ground of doubt here that PHH's conduct violated the Debtor Current Orders and, in the absence of any Second Circuit decisions to the contrary, this Court concludes it possesses the authority, under its inherent powers and § 105, to impose punitive sanctions on PHH for its violation of the Debtor Current Orders.

Next, the Court looks to the financial markers associated with PHH's violations to assess the gravity of its misconduct and discern the proper amount of sanctions. The District Court concluded the original sanctions were "serious" punitive sanctions based, in part, on two financial markers: the total amount of the sanctions imposed on PHH for its misconduct in all three cases ($375,000), and the small amount of the fees and charges PHH erroneously claimed due from the each of the Debtor-borrowers on the inaccurate statements PHH sent in violation of the Debtor Current Orders and Rule 3002.1 (ranging from $30.00 to $258.75) (doc. # 104, p. 2). The Remand Decision did not, however, limit this Court's discretion in reassessing the sanctions, and reformulating new, non-serious sanctions, to amounts that correlated directly to the amount of the charges on each incorrect statement. Based on the pertinent caselaw, this Court concludes the appropriate measure of the gravity of PHH's misconduct is not the sum of the amounts PHH claimed due on each statement, but rather the number of incorrect statements PHH sent, in violation of both Rule 3002.1 and the Debtor Current Orders.

In further response to the financial markers identified in the Remand Decision, the Court must determine whether to focus on the sum of the sanctions imposed in all three cases, or the sanctions imposed in each case individually, when assessing whether the sanctions it is now imposing are less than "serious." None of the cases this Court has found addressing either the maximum amount of a non-serious sanction, or the appropriate sanction warranted for an analogous violation of Rule 37, indicate any basis for gauging the seriousness of a sanction by reference to sanctions imposed across multiple cases. To limit the sanction imposed on PHH in any one of the three cases, based on the fact that the sum of the sanctions imposed in the three cases crosses over into the zone of a "serious sanction," would constitute a windfall for PHH. The three cases are before the Court in a consolidated fashion solely as a result of the Court's decision to address the Trustee's motions in these cases simultaneously, in the interest of judicial economy, and for no reason that bears on the nature or gravity of PHH's malfeasance in each of these

---

[35] In Taggart, the Supreme Court affirmed the bankruptcy court's basis for imposing a sanction that included $105,000 for attorney's fees and costs, $5,000 for emotional distress, and $2,000 in punitive damages. Taggart v. Lorenzen, No. 18-489, slip op. at 4 (U.S. June 3, 2019).

three distinct cases.[36] Therefore, the Court evaluates the seriousness of each sanction it imposes in this decision on a case-by-case basis, independent of the size of any other sanction it imposes in this decision.

Against that backdrop, the Court is charged with detecting where the line is that distinguishes a serious sanction from a non-serious sanction. It fulfills this charge, in accord with the Remand Decision, by following the guidance of the Sixth, Ninth, and Second Circuits.

The Sixth Circuit, as expressed in the <u>Richards</u> case to which the Remand Decision points, makes clear that bankruptcy courts may impose "mild" punitive sanctions under § 105, and may not impose serious punitive sanctions, but makes this pronouncement without articulating the criteria that characterize a sanction as either "mild" or "serious." <u>In re John Richards Homes Bldg. Co.</u>, 552 F. App'x 401, 415-516 (6th Cir. 2013). The only hint the Sixth Circuit gives as to how one can identify a serious sanction is its conclusion that a $2.8 million sanction against an individual is "serious." Since the Sixth Circuit issued the <u>Richards</u> decision, a district court in that circuit affirmed a bankruptcy court's imposition of a punitive sanction in the amount of $5,000 against a corporation. <u>Franklin Credit Mgmt. Corp. v. Cook</u>, 551 B.R. 613, 625 (M.D. Tenn. 2016). In the context of the facts of that case, and the other sums the creditor was ordered to pay, the district court found the $5,000 punitive sanction the bankruptcy court had imposed was "mild." <u>Id</u>. To comply with the <u>Richards</u> admonition not to impose a serious sanction on PHH, this Court is left to discern where the boundary between a mild and serious sanction lies in this case, which, based upon the Sixth Circuit continuum, is somewhere between $5,000 and $2.8 million.

The Ninth Circuit caselaw also limits bankruptcy courts' authority to impose sanctions, holding they may impose only modest punitive sanctions. It, however, is rather vague about how to parse what distinguishes a modest sanction from a serious sanction. <u>See</u> <u>Knupfer v. Lindblade (In re Dyer)</u>, 322 F.3d 1178 (9th Cir. 2003). In applying Ninth Circuit precedent, lower courts have both taken into account the financial circumstances of the offending party, and converted the applicable dollar cap to its present value, when assessing a punitive sanction they intend to be less than "serious."[37] The delineation of serious sanctions that have emerged from the Ninth Circuit jurisprudence are, first, a fine above $5,000 in 1989 dollars, on an individual, is serious, <u>id.</u> at 1193, and, second, a $10,000 punitive sanction imposed on a corporate mortgage servicer is "less than a serious punitive penalty." <u>In re Grihalva</u>, 2013 Bankr. LEXIS 4057, at **21–23 (Bankr. D. Nev. 2013).

---

[36] The Trustee filed his motions for contempt in all three cases within a two-day period. <u>See</u> Gravel, no. 11-10112, doc. # 75; Beaulieu, no. 11-10281, doc. # 90; Knisley, no. 12-10512, doc. # 50. The Court combined the hearings, and issued a single decision addressing all the Trustee's motions, due to the common identity of the offending party in all three cases, the similarity of PHH's actions and alleged violations in the three cases, and a desire to promote judicial economy and cost-efficiency. This Court made no finding that the amount of the sanction imposed on PHH in any one case was contingent upon, or related to, the violations in the other cases, or that the Court intended the sanctions to be treated as a single sanction.
[37] <u>See</u> discussion of <u>Dyer</u> and its progeny at Part C(2).

Finally, and most importantly, this Court draws on the guidance of the Second Circuit to ascertain what it identifies as the dollar amount floor of a "serious sanction," how that floor may fluctuate depending on whether the party to be sanctioned is a corporation or an individual, and whether this Court may adjust the dollar limit on the floor that Court has set to reflect the dollar amount's present value. Although the Second Circuit has not enunciated the scope of a bankruptcy court's authority to impose punitive sanctions,[38] as this Court described above,[39] the Second Circuit has, in the context of other areas of the law, established solid guideposts as to what constitutes a "serious sanction" both with regard to individuals and corporations. See Mackler II, 225 F.3d 136 (2d Cir. 2000). In 1989, the Second Circuit set the cap for a non-serious sanction, on a corporation, at $100,000 (or $205,531.30 in 2019 dollars). United States v. Twentieth Century Fox Film Corp., 882 F.2d 656, 665 (2d Cir. 1989).[40] More recently, the Second Circuit has emphasized the equitable nature of punitive sanctions, and the appropriateness of factoring in the wealth of the party to be sanctioned. See CBS Broad. Inc. v. FilmOn.com, Inc., 814 F.3d 91, 103–104 (2d Cir. 2016); Shangold v. Walt Disney Co., 275 Fed. Appx. 72 (2d Cir. 2008). Applying the detailed rationale of these cases, and the Second Circuit's determination that a party's financial circumstances should factor into the computation of what amount of damages is sufficient to deter, this Court concludes a sanction of less than $205,531.30 would be less than a serious punitive sanction on PHH, and appropriate if, given PHH's financial resources, the Court determines a sanction of less than that magnitude would not be effective in deterring future misconduct.

Starting with the premise that the District Court did not disturb any of this Court's factual findings it made with respect to PHH's violations of Rule 3002.1 and the Debtor Current Orders, and relying on the pertinent case law from the Sixth, Ninth and Second Circuits with respect to the scope of bankruptcy courts' authority to impose punitive sanctions, and the decisions from within this Circuit that broadly construe the arsenal of sanctions courts may impose for Rule 37-type violations, as well as the general guidance from the Supreme Court granting bankruptcy courts the authority to impose sanctions for injunction violations, this Court concludes that, based on the circumstances of, and violations by, this multi-billion dollar financial institution, the following sanctions each fall within the scope of a non-serious sanction and, therefore, are within this Court's authority to impose.

---

[38] See Remand Decision, doc. # 104, p. 11.

[39] See discussion at Part C(1).

[40] As explained in Part C(1)(b), while Twentieth Century Fox considered the amount at which a fine or sanction triggers a corporation's right to a jury trial, this amount can be soundly analogized to the amount at which a sanction can be considered serious. This is precisely the analytical approach utilized by the Ninth Circuit in its Dyer decision, which the District Court cited favorably. See Knupfer v. Lindblade (In re Dyer), 322 F.3d 1178, 1193 (9th Cir. 2003) (basing its finding that the imposition of any fine above $5,000 could be considered serious, as against an individual, on the 1989 Supreme Court case Blanton v. N. Las Vegas, 489 U.S. 538 (1989), which involved a potential cutoff for a serious fine warranting a jury trial in the case of two individuals convicted of driving under the influence.)

In the Gravel case, the Court previously imposed a sanction of $200,000, based, in large measure on the fact that it was PHH's second violation of an Order of this Court. The previous Order, entered in March of 2014 (doc. #49), not only sanctioned PHH for sending the Debtors inaccurate mortgage statements, but also unambiguously declared the debtors were current as of that date:

> [The Trustee] having filed a Motion to Compel [PHH Mortgage] to correct misapplied mortgage payments disbursed to it by the trustee in this case and for sanctions arising from its failure during this case to correctly apply such payments, the trustee and PHH, by filing their consent to this order, have stipulated and agreed to the following:
>
> (1) Subsequent to the filing of the motion, PHH has taken steps to re-apply the misapplied mortgage payments, paid to it by the trustee, and is now showing the debtor's mortgage payments, post-petition, as current[.]

Sanctions Decision, doc. # 82, pp. 14-15 (quoting doc. # 49). PHH violated that Order and violated the Debtor Current Order entered thereafter (doc. # 74). Taking into account PHH's repeated contemptuous conduct, its substantial financial resources, and the limitations on this Court's sanctioning authority, it imposes a sanction of $150,000 on PHH for PHH's violations of this Court's Orders in the Gravel case. See Shangold v. Walt Disney Co., 275 Fed. Appx. 72 (2d Cir. 2008); Oliveri v. Thompson, 803 F.2d, 1265, 1281 (2d Cir. 1986). The Court also gives significant weight to the fact that PHH gave the Court emphatic assurances that the corrective measures PHH implemented as a result of the negotiations leading to its payment of a $9,000 sanction in 2014 would prevent precisely the sloppy or inattentive record keeping that underlies the instant violations. Moreover, although the Court is not entirely confident a $150,000 sanction will be sufficient to deter PHH from continuing to violate the Debtor Current Order in this case, it seems plausible that it will and nothing less would. With respect to the 25 incorrect notices, the Court reimposes the $25,000 sanction, finding it is the appropriate sanction for the repeated violations of Rule 3002.1(c). The sum of these two sanctions ($175,000) is consistent with the District's Court mandate to impose a less than serious sanction based on the Second Circuit's declaration that a serious sanction is one that exceeds $100,000 in 1989 dollars, i.e., $205,531.30 in 2019 dollars. See United States v. Twentieth Century Fox Film Corp., 882 F.2d 656, 665 (2d Cir. 1989).

In the Beaulieu case, the previously imposed $100,000 sanction for PHH's violation of the Debtor Current Order is reduced to $75,000. This sanction amount reflects the fact that this was PHH's first violation of an Order in this case and is one-half of the corresponding sanction for violation of the Debtor Current Order in the Gravel case. The Court reimposes the $25,000 sanction, as the appropriate sanction for the 25 incorrect notices PHH issued in violation of Rule 3002.1. This total sanction of $125,000 is not "serious" or beyond this Court's authority to impose because it is below the Second Circuit's $100,000 cap (in 1989 dollars), adjusted for present value. See Twentieth Century Fox, 882 F.2d at 665.

32

In the Knisley case, this Court imposes the same $25,000 sanction it previously imposed for PHH's 25 incorrect notices issued in violation of Rule 3002.1(c). There is nothing in the Remand Decision or the caselaw that convinces this Court that this sanction, in and of itself, is "serious" or beyond the authority of this Court to impose. Rather, it reflects the Court's broad authority under Rule 3002.1, as shown in the caselaw sanctioning violations of Rule 37 (upon which Rule 3002.1 was modeled), to impose such other appropriate relief as is warranted under the circumstances. See, e.g., Nycomed US, Inc. v. Glenmark Generics Ltd., 2010 U.S. Dist. LEXIS 82014 (E.D.N.Y. 2010); Bradley v. Sunbeam Corp., 2003 U.S. Dist. LEXIS 14451 (N.D. W. Va. 2003); Pereira v. Narragansett Fishing Corp., 135 F.R.D. 24 (D. Mass. 1991); M. Cleminshaw Co. v. Norwich, 93 F.R.D. 338 (D. Conn. 1981).

### E. To Whom PHH Must Pay the Sanctions

The District Court did not disturb this Court's decision that PHH pay all of the sanctions imposed in the Sanctions Decision to the non-profit organization now known as Legal Services Vermont[41] (doc. # 82, p. 17). This Court designated that payee in recognition of the crucial need for vigilant advocacy on behalf of individuals who seek bankruptcy relief in this District.

> The Debtors in these cases might well have found themselves confronted with unexpected charges and possible suit by PHH, after their bankruptcy cases were concluded, if the Trustee had not been zealous in his efforts to compel PHH to remove the incorrect charges from the Debtors' monthly mortgage statements. Without the Trustee's vigilance and his filing of the Sanctions Motions, the Debtors' fresh start might have been jeopardized – just as the drafters of Rule 3002.1 had warned.

Doc. # 82, p. 17. Because the Debtors did not present any evidence showing they suffered financial harm, and to avoid unjustly enriching the Trustee or the Debtors, the Court awarded the sanctions to "Vermont's lead provider of pro bono legal services in bankruptcy cases" (doc. # 82, p. 17).

In the Trustee's Motion, the Trustee asks this Court, inter alia, to order payment of the full amount of the original sanctions to him, in four annual installments (doc. # 119, p. 1). While the Court has denied the Trustee's Motion, in most respects, see doc. # 133, the Court finds the Trustee's request to "conduct a new windfall analysis," in light of the entire record in these cases, and direct PHH to pay a portion of the sanctions to his office, rather than to pay it entirely to Legal Services Vermont (doc. # 119, p. 9), is within the Court's discretion on remand. The Trustee's arguments are compelling and, in light of the efforts the Trustee has made since entry of the Court's Sanctions Decision, justify a modification to the Court's original designation of payee.

---

[41] At the time of this Court's Order it was known as Legal Services Law Line of Vermont; as of January 25, 2019, its legal name is Legal Services Vermont. See Press Release, Legal Services Vermont, 'Law Line' is Now 'Legal Services Vermont,' (Jan. 25, 2019), https://legalservicesvt.org/law-line-now-legal-services-vermont.

*1. PHH to Pay the Sanctions for Its Violations of Rule 3002.1 to the Trustee*

The Court finds it appropriate and just to direct PHH to pay the Rule 3002.1 sanctions, of $25,000 in each of the three cases, to the Trustee, for several reasons. Although the caselaw on the question of awarding a chapter 13 trustee sanctions under Rule 3002.1(i) is undeveloped, at least one court considered the question. See In re Gutierrez, 2012 Bankr. LEXIS 5110 (Bankr. D.N.M. 2012). In Gutierrez, the court declined the trustee's request for an award of reasonable expenses and attorney's fees under 3002.1(i)(2), but that was because it granted the creditor additional time to comply with its Rule 3002.1 obligations and ultimately declined to impose sanctions. Id. at **10–12. While acknowledging the dearth of caselaw awarding 3002.1 sanctions to a trustee, the Court is guided by other sources of authority for this relief.

First, the language of Rule 3002.1(i), and its contemporaneously enacted counterpart Rule 3001(c)(2)(D), do not contain the restrictive language found in § 362(k) that allows the award to be paid only to the injured individual debtor. See § 362(k)(1) ("…an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorney's fees, and, in appropriate circumstances, may recover punitive damages."). Several courts, including this Court, have found that a trustee "is not eligible to sue for damages pursuant to § 362(k)(1)." Sensenich v. Ledyard Nat'l Bank (In re Campbell), 398 B.R. 799, 815 (Bankr. D. Vt. 2008); see also In re Dyer, 322 F.3d 1178, 1189 (9th Cir. 2003); In re Chateaugay Corp., 920 F.2d 183 (2d Cir. 1990). Rule 3002.1, by contrast, does not include this limitation, thus opening the door for courts to treat a trustee as an eligible recipient of Rule 3002.1 sanctions.

Second, there is an established body of caselaw demonstrating a court's authority to award sanctions to a chapter 13 trustee under Rule 3001(c)(2)(D), the companion sanction provision to Rule 3002.1(i). See Advisory Committee Minutes from Spring 2010 Meeting (in which the Reporter noted the sanctions provision under Rule 3002.1 "was intended to parallel the sanctions provisions the Committee just reviewed and modified in Rule 3001(c)(2)(D), and said the changes to both provisions should be the same").[42] In two instances, the Bankruptcy Court for the Eastern District of Michigan has awarded the chapter 13 trustee sanctions under Rule 3001(c)(2)(D) for the costs and expenses incurred when creditors failed to submit the supporting information to a proof of claim, as required by Rule 3001(c). See In re Ball, 2019 Bankr. LEXIS 179 (Bankr. E.D. Mich. 2019); In re Simerson, 2018 Bankr. LEXIS 3711 (Bankr. E.D. Mich. 2018). The bankruptcy court found that "unexplained deficiencies and delays in filing a full and complete proof of claim did cause the Trustee to devote more attention than was usual to solve a

---

[42] Advisory Committee on Rules of Bankruptcy Procedure, Minutes, p. 10 (Apr. 29–30, 2010), https://www.uscourts.gov/rules-policies/archives/meeting-minutes/advisory-committee-rules-bankruptcy-procedure-april-2010 [hereinafter April 2010 Advisory Committee Minutes].

rather straightforward issue of payment of real estate taxes." <u>Simerson</u>, 2018 Bankr. LEXIS 3711, at *8.
The court awarded sanctions based on the fees that were incurred, and could have been avoided, had the
creditors complied with their Rule 3001(c) requirements. <u>Id.</u> at **8-9 (awarding $400 to the chapter 13
trustee); <u>Ball</u>, 2019 Bankr. LEXIS 179, at **6-7 (awarding $200 to the chapter 13 trustee). While these
cases involved relatively minor, one-time infractions by creditors that were quickly resolved and thus did
not merit large sanctions awards, the decisions establish a well-reasoned basis for awarding sanctions to a
chapter 13 trustee for work performed in addressing Rule 3001(c) and Rule 3002.1 violations. This is in
addition to those cases in which courts have awarded sanctions to trustees under Rule 37, on which
3002.1 was modeled, and under § 105 and their inherent powers. <u>See, e.g.</u>, <u>In re Haynes</u>, 577 B.R. 711,
757–58 (Bankr. E.D. Tenn. 2017) (awarding Rule 37 sanctions, totaling $15,000, to the chapter 13 trustee
for work necessary to compel UpRight Law to provide discovery responses); <u>Sensenich v. Ledyard Nat'l
Bank (In re Campbell)</u>, 398 B.R. 799, 815 (Bankr. D. Vt. 2008) (finding the chapter 13 trustee may seek
sanctions under the Court's contempt powers pursuant to § 105(a)); <u>In re Ambotiene</u>, 316 B.R. 25, 30, 40
(Bankr. E.D.N.Y. 2004) (awarding chapter 7 trustee $7,253 under § 105(a) for creditor's role in
"interfering and obstructing [the trustee's] efforts to carry out his statutory and fiduciary duties" under the
Bankruptcy Code), <u>aff'd</u> <u>sub nom</u> <u>Grand St. Realty, LLC v. McCord</u>, 2005 U.S. Dist. LEXIS 45314
(E.D.N.Y. 2005) (affirming the sanction under both § 105(a) and the bankruptcy court's inherent powers).

   Third, some courts, while not characterizing such measures as punitive in nature, have awarded
sanctions to trustees in a flat amount, without reference to specific fees or expenses. In <u>In re Nettles</u>, 2008
Bankr. LEXIS 1293 (Bankr. D.S.C. 2008), the bankruptcy court awarded the chapter 7 trustee $8,976.40
for attorney's fees and costs. <u>Id.</u> at *14. The <u>Nettles</u> court, however, went further and awarded an
additional $2,500 under its inherent powers "in reimbursement of the expenses incurred for Trustee's law
firm[,]" without tying that amount to timesheets or other evidence to certify the fees or costs earned. <u>Id.</u> at
*22. In <u>In re Parker</u>, 2014 U.S. Dist. LEXIS 136355 (E.D. Va. 2014), the district court upheld the
bankruptcy court's awarding of a $1,000 sanction in each of four cases "as reimbursement for expenses
incurred by the trustee attending to [the sanctioned party's] transgressions." <u>Id.</u> at *20. The appellant
argued these sanctions amounted to unauthorized criminal contempt fines, but the district court held the
$4,000 in sanctions, which were not linked to specific fees or expenses documented by the trustee,
constituted "a reimbursement sanction meant to make the other parties to the proceeding whole and not a
criminal contempt order meant to punish." <u>Id.</u> at *21. The court went on to find the sanctioned party's
"actions and failures to act resulted in wasted time and effort by the Chapter 13 Trustee in each of the four
cases in which the reimbursement sanction was imposed." <u>Id.</u> at *22. <u>See also</u> <u>In re September 11th Liab.
Ins. Coverage Cases</u>, 243 F.R.D. 114, 132 (S.D.N.Y. 2007) (awarding attorney's fees in a "flat and

sizeable amount" where the court found "precision in determining the amounts of time the parties devoted to this issue, separate from all other issues, is not possible."). This Court awards the sanctions to the Trustee, as the courts did in the <u>Nettles</u> and <u>Parker</u> cases, based on the circumstances presented rather than timesheets or billing records. It finds the Trustee deserves the Rule 3002.1 sanctions to compensate him for the expenses he and his office incurred, as well as the substantial attention, time and effort he devoted to detecting, describing, and acting on PHH's failures to comply with its Rule 3002.1 obligations.

Finally, awarding the sanctions which are attributable to PHH's Rule 3002.1 violations to the Trustee accords with and advances the underlying deterrent purpose of these sanctions (doc. # 82, p. 17).[43]

The Trustee "wear[s] many hats and perform[s] several functions," <u>In re Harwood</u>, 519 B.R. 535, 542 (Bankr. N.D. Cal. 2014), including many prominent duties associated with Rule 3002.1. Among those duties is the filing of a notice of final cure payment once a debtor completes all payments under the plan and, within this district, the filing of a motion to determine final cure and payment. <u>See</u> FED. R. BANKR. P. 3002.1(f),(h). The chapter 13 trustee's role is critical in protecting Vermont debtors from the harm Rule 3002.1 is "designed to address[; i.e.] the accumulation of unpaid fees and charges over the course of the case, resulting in a large deficiency when the debtor emerges from bankruptcy court with the expectation of a fresh start." April 2010 Advisory Committee Minutes, <u>supra</u> note 42, at 7. That role is evident in these cases where, as the Court previously observed, "[w]ithout the Trustee's vigilance and his filing of the Sanctions Motions, the Debtors' fresh start might have been jeopardized – just as the drafters of Rule 3002.1 had warned" (doc. # 82, p. 17). Thus, in addition to serving the underlying deterrent purposes of the sanctions, awarding a portion of the sanctions to the Trustee both compensates the Trustee for his efforts in preventing PHH's misconduct from causing real economic harm to debtors in this district, and strengthens the Trustee's "enforcement capacity" and ability to monitor creditors' compliance with Rule 3002.1 going forward (doc. # 119, p. 10).

*2. <u>PHH to Pay the Sanctions for Its Violation of Debtor Current Orders to Legal Services Vermont</u>*

As with the federal discovery rules on which it was modeled, one purpose of Rule 3002.1 "is to provide a level playing field, to the extent possible, in confronting the opposing party's evidence." <u>Kuhlman v. Louisville Ladder, Inc.</u>, 2014 U.S. Dist. LEXIS 199433, at *10 (M.D. Fla. 2014). This sentiment is especially true within the context of Rule 3002.1, where a creditor possesses the records that

---

[43] The "Rule 37 sanctions," on which the Rule 3002.1 sanctions were modeled, "must be applied diligently both 'to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of such a deterrent." <u>Roadway Express Inc., v. Piper</u>, 447 U.S. 752, 763–64 (1980) (quoting <u>National Hockey League v. Metropolitan Hockey Club</u>, 427 U.S. 639, 643 (1976)).

would establish (or disprove) any outstanding postpetition obligations it claims the borrower owes. See In re Hockenbeger, 2018 Bankr. LEXIS 1120, at *9 (Bankr. N.D. Ohio 2018) (finding the burden is on the mortgage holder to establish outstanding postpetition obligations on a mortgage in a 3002.1(h) motion); In re Ferrell, 580 B.R. 181, 185 (Bankr. D.S.C. 2017) (same); In re Kreidler, 494 B.R. 201, 2014 (Bankr. M.D. Pa. 2013) (same).

In a broader sense, Rule 3002.1 was designed to protect debtors' fresh starts after emerging successfully from a chapter 13 bankruptcy. See Wedoff, supra at 584. The provisions of Rule 3002.1 allow for either the chapter 13 trustee, or the debtors themselves, to file the notice of final cure payment or a motion to determine final cure and payment, and thereby obtain the assurance of a Debtor Current Order. See FED. R. BANKR. P. 3002.1(f), (h). Subparagraph (i) provides the mechanism to protect debtors' fresh starts in the face of creditor violations of Rule 3002.1 and Debtor Current Orders, after a case has concluded:

> If, after the chapter 13 debtor has completed payments under the plan and the case has been closed, the holder of a claim secured by the debtor's principal residence seeks to recover amounts that should have been but were not disclosed under this rule, the debtor may move to have the case reopened in order to seek sanctions against the holder of the claim under subdivision (i).

FED. R. BANKR. P. 3002.1 Advisory Committee's 2011 note.

This places enormous pressure on debtors to monitor the statements issued by creditors following their discharges, and to take measures to protect themselves from efforts to collect unauthorized fees and expenses, and to protect their homes from possible foreclosure. This underscores the critical debtor-protector role debtors' attorneys must play. Many homeowners facing foreclosure are in financial crisis and lack effective legal representation. See Melanca Clark & Maggie Barron, Foreclosures: A Crisis in Legal Representation, BRENNAN CENTER FOR JUSTICE, p. 12 (2009) (finding many homeowners possess legal defenses that could bar foreclosure, but cannot effectively raise them absent the assistance of counsel). Access to a competent attorney, who will recognize creditor violations and advocate zealously on a debtor's behalf, is one of the most essential tools for protecting debtors' fresh starts and accomplishing the goals of Rule 3002.1 and Debtor Current Orders. See In re Miller, 2015 Bankr. LEXIS 4530 (Bankr. D. Vt. 2015). As the Brennan Center concluded,

> The loan servicers and lenders invariably have counsel whenever they take action against a homeowner for alleged default of the mortgage terms. Providing lawyers for low- and moderate- income homeowners would level the playing field, and help to ensure that banks and other institutions that operate in economically distressed communities do so according to the rule of law.

Clark & Barron, supra, at 16–17.

Mindful of the distress many homeowners experience in trying to defend against actions commenced by mortgage creditors with experienced counsel, this Court reiterates its belief, as originally stated in the Sanctions Decision, that "the best way to protect consumer debtors who cannot afford to dispute and litigate the assessment of improper post-petition charges – and thus are at risk of having their fresh starts diluted[,]" is to direct PHH to pay sanctions to a pro bono legal service provider (doc. # 82, p. 17). The Court remains convinced it is equitable, and serves the interests of justice, to direct PHH to pay the sanctions flowing from PHH's violations of the Debtor Current Orders, i.e., the $150,000 sanction in the Gravel case and the $75,000 sanction in the Beaulieu case, to Legal Services Vermont.

## VI. CONCLUSION

For the reasons set forth above, the Court reaches the following conclusions with respect to the six interlocking legal issues presented. First, this Court has the authority to issue punitive sanctions against PHH for its violations of Bankruptcy Rule 3002.1, in all three of these cases, based on the detailed explanations of the Rule's purpose and the intent of its drafters, as set out in the records of the Advisory Committee that formulated the Rule, and the court decisions which constitute persuasive authority regarding this question, in their analysis of analogous or similar language in Bankruptcy Rule 3001(c) and Federal Civil Rule 37. Second, this Court has authority to sanction PHH for its breach of the Debtor Current Orders in the Gravel and Beaulieu cases, pursuant to § 105(a) and its inherent powers. Third, the sanctions this Court imposes on PHH herein fall within the caselaw definitions of "modest" and "less than serious" sanctions, from the Second, Sixth and Ninth Circuits, i.e., the Circuits to which the Remand Decision directed this Court's attention. Fourth, that same caselaw provides a sound basis for this Court to take into account PHH's corporate status, the repetitive nature of its violations, and its relative wealth and ability to pay in setting the amount of the sanctions. Fifth, based on the well-established jurisprudence that assigns upper monetary limits to the various categories of sanctions germane to this decision, as well as the more recent trial and appellate level decisions that adjust those dollar amounts to reflect present dollar value, this Court concludes it is proper to apply the monetary caps, adjusted to reflect their value in 2019 dollars. Sixth, the Court finds that although the chapter 13 Trustee has not documented the number of hours he or his pro bono attorney have spent in addressing the myriad issues raised in these cases, it is clear that (a) their efforts shielded the Debtors from having to pay improper charges and from incurring the cost of legal actions that might have flowed from a failure to pay them, and (b) it was – and will continue to be – within the scope of the Trustee's duties to vigilantly monitor mortgage creditors' compliance with Rule 3002.1, and as such, it is fair to direct that portion of the sanctions allocable to PHH's violation of Rule 3002.1 ($75,000) to the chapter 13 Trustee. Analogously, the fact that the

Debtors did not suffer financial harm when PHH violated the Debtor Current Orders in the Gravel and Beaulieu cases does not diminish the need to impose sanctions on PHH for punitive and deterrent purposes. It is most appropriate that PHH pay these sanctions ($225,000) to Legal Services Vermont, the premier provider of pro bono legal services to the individuals who are most vulnerable to harm when a creditor fails to adhere to the injunctions in Debtor Current Orders, and most in need of protection from mortgagors who do not play by the rules.

Accordingly, and pursuant to its mandate on remand, the Court (1) reduces the combined sanction from $225,000 to $175,000 in the Gravel case, reduces the combined sanction from $125,000 to $100,000 in the Beaulieu case, and leaves intact the $25,000 sanction in the Knisley case; (2) directs PHH to pay the sanctions for violations of court orders, i.e., $150,000 in the Gravel case and $75,000 in the Beaulieu case, to Legal Services Vermont; and (3) directs PHH to pay the sanctions for violations of Rule 3002.1, i.e., $25,000 in each of the three cases, to the chapter 13 Trustee, as more fully described in the accompanying Order.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law, and implementation of the Remand Decision.

Burlington, Vermont
June 27, 2019

Colleen A. Brown
United States Bankruptcy Judge

39